**HUDSON TRAIL OUTFITTERS, and PMA Insurance Group, Petitioners,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Patricia A. Gibson, Intervenor.**

**No. 01–AA–966.**

District of Columbia Court of Appeals.

Argued May 16, 2002.
Decided July 3, 2002.
As Amended July 24, 2002.

Douglas A. Datt, Rockville, MD, with whom Rhoda S. Barish, was on the brief, for petitioners.

Jack T. Burgess, Washington, DC, for intervenor.

Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corpora-

tion Counsel, filed a statement in lieu of brief for respondent.

Before TERRY, STEADMAN, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Petitioners Hudson Trail Outfitters and PMA Insurance Group contest a decision of the Department of Employment Services ("DOES") continuing an award of death benefits to Patricia Gibson under D.C.Code § 36–309(2) (1997), the predecessor statute (identical in language) to the present § 32–1509(2) (2001). The underlying workers' compensation claim arose when Patricia Gibson's husband died in a work-related event on November 30, 1990. Mrs. Gibson received death benefits until February 16, 1998, when petitioners filed a notice of controversion to discontinue the benefits on the basis of her alleged remarriage in Nicaragua. After a hearing, the examiner concluded that Gibson remained eligible to receive death benefits under the applicable law of Virginia and Nicaragua, and the Director of DOES affirmed. We uphold the Director's decision.

## I.

At the time of the hearing, Mrs. Gibson had resided in Virginia with Zamir El Azar since 1992. In July 1996 the couple traveled to Mr. El Azar's native country of Nicaragua where they participated in a Catholic ceremony and exchanged religious vows in the presence of a priest and witnesses. The hearing examiner found, however, that the marriage was never recorded in the civil registry in Nicaragua and that Nicaragua law as cited to him by the parties made such recording a requirement for a religious union to be recognized civilly. Evidence at the hearing also established that, although Gibson and El Azar had lived together for a substantial length of time in Virginia, they both consistently filed separate tax returns, and, despite Gibson's rare references to El Azar as her husband, she generally held herself out to the public as unmarried.

## II.

■ D.C.Code § 32–1509(2) provides that if a work-related injury causes the death of an employee, a widow or widower of the employee is entitled to a percentage of the decedent's average wages "during widowhood[ ] or widowerhood," but that "upon [her or his] remarriage" this converts to a lump-sum payment, with no further workers' compensation.[1] As indicated, the primary dispute in this case is over whether Mrs. Gibson remarried in Nicaragua. The parties agree that, in the first instance, Virginia law governs this dispute because, although Mr. Gibson died as a result of a work-related event in the District of Columbia (and was awarded benefits here), all other relevant contacts—including residency—were formed between Mrs. Gibson and Virginia. Further, under Virginia law "a marriage's validity is to be determined by the law of the state where the marriage took place," unless the result would contradict or offend public policy. *Kelderhaus v. Kelderhaus,* 21 Va.App. 721, 467 S.E.2d 303, 304 (1996). The parties therefore agree that whether or not Mrs. Gibson validly remarried in Nicaragua is answered by Nicaragua law. They disagree on the answer.

■ The meaning of a foreign law "call[s] for ruling on a question of law rather than fact." *Bamberger v. Clark,* 129 U.S.App. D.C. 70, 73, 390 F.2d 485, 488 (1968) (footnote omitted). *See* Super. Ct. Civ. R. 44.1. But, although we independently consider the meaning of the foreign

1. Additional benefits paid to the surviving children are increased upon the remarriage.

statutes cited to us (and to the agency), a concern arises in a case such as this whether the parties have presented us with the complete body of relevant statutory and interpretive foreign law, here Nicaragua's law governing the conditions for a valid civil marriage. We do not consider it our obligation, or to have been the Director's, to look beyond the statutes petitioners cited at the administrative level to support their claim of remarriage by Gibson. They had the burden of establishing the remarriage as a changed statutory circumstance disqualifying her from continued benefits. *Cf.Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 703 A.2d 1225, 1231 (D.C.1997) ("In the context of workers' compensation law, the burden of showing a change of conditions has ... been held to be on the party claiming the change,...."). We thus confine ourselves to examination of the statutes considered by the examiner and the Director.

█ The key provision cited to the agency was as follows:

The law considers marriage as a contract. In general, marriage must be performed before civil functionaries determined by law.

However, those professing the religion of the majority of Nicaraguans, which is the Catholic Apostolic and Roman religion, may celebrate their marriages before the priest or competent ecclesiastic authority according to the precepts of the Catholic Church. In order for marriages celebrated before the ecclesiastic authority, according to the preceding paragraph, to produce civil effects, *it will be essential that the certificates issued by the parish be recorded in the Registry of the Civil Status of Persons.*

Codigo Civil de la Republica de Nicaragua, Titulo II, Capitulo I, art. 95 [Civil Code of the Republic of Nicaragua, tit. II, ch. I, art. 95] (emphasis added). As petitioners do not dispute that the marital certificate was not recorded in this manner, the issue before us is one of statutory construction: what is the legal consequence of that failure? Like this court, the courts of Virginia follow the rule that ordinarily, "[w]hen the language of a statute is plain and unambiguous, we are bound by the plain meaning of that language." *Vaughn, Inc. v. Beck*, 262 Va. 673, 554 S.E.2d 88, 90 (2001). On its face, the language of the Nicaragua Code appears unambiguous:[2] for a marriage performed by ecclesiastic authority to be recognized civilly, it is "essential" that the parish certificate be recorded in the named civil registry. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 777 (1971) ("essential" means "something necessary, *indispensable,* or unavoidable") (emphasis added); BLACK'S LAW DICTIONARY 490 (1979) ("essential" means "indispensably necessary; ... [t]hat which is required for the continued existence of a thing"). If, by reason of other legislation or interpretive authority, the language does something less than establish a *prerequisite* to a valid civil marriage in Nicaragua, it is petitioners' burden to show that fact. They have not done so.

█ Petitioners argue, for example, that recordation is—literally—a "ministerial" act not affecting the civil validity of the marriage. For this they cite Title II, Chapter X, article 563 of the Civil Code, which states that "the minister of any religion ... when performing a marriage, or verifying a burial, shall advise the Registrar

---

**2.** Petitioners do not challenge before us the accuracy of the certified translations of Nica-ragua laws appearing in the record.

thereof." But the fact that the duty of registration is binding upon the minister does not imply, without more, that a valid marriage results if he or she defaults; petitioners have cited no authority suggesting that Nicaragua courts treat "what should have been done as done" in this context, when the opposite seems just as likely: the "civil effects" of marriage, presumably in Nicaragua as elsewhere, may be deemed important and pervasive enough to warrant strict compliance with requirements such as recordation.

■ We also are not persuaded by petitioners' reliance on Nicaragua's annulment statute (tit. II, ch. 1, art. 107) providing that "a marriage contracted in good faith produces civil effects even if it is declared null." On the record before us, the meaning of annulment, and its relation to marriages that are not recorded—and thus do not produce "civil effects"—is wholly unilluminated by Nicaragua law.[3] Petitioners further cite a provision of the Constitution of Nicaragua which "[protects m]arriage and stable *de facto* unions" that are based on a "voluntary agreement." NICAR. CONST., ch. IV, Family Rights, art. 72. From this they argue that Nicaragua would give effect to the *intent* of Mrs. Gibson and Mr. El Azar to be married despite the failure of the priest to file the certificate. In fact, though, the hearing examiner made no finding whether the

couple meant their religious union to be recognized civilly,[4] and we decline petitioners' invitation to remand for a finding on that point. They offered no evidence of what Nicaragua means by a "stable *de facto* union," which on its face resembles this jurisdiction's common law marriage. Would it apply, for example, to non-citizens, and to persons like Gibson and El Azar who had been in the country as visitors for barely two weeks? The fact that Nicaragua recognizes some *de facto* unions, in short, tells us nothing about whether it would disregard the failure to meet the statutory requirement for a civil marriage.

■ Lastly, although petitioners do not argue directly that the Gibson–El Azar relationship was a common law marriage under District of Columbia law, *see, e.g.,* *McCoy v. District of Columbia,* 256 A.2d 908, 910 (D.C.1969),[5] they argue that Gibson should be "equitably estopped" from claiming widow's benefits because, "for all practical purposes, [she has] remarried" (Br. for Pet. at 31). We do not perceive how "equity" comes into play when the intent of the compensation statute to allow a widow or widower to receive spousal benefits absent remarriage—either a formal or (in the District) common law marriage—is plain on its face. Gibson, as petitioners assert, may have gone to

3. We do know that under Virginia law a marriage later annulled is not regarded as void, but merely voidable. *See Payne v. Commonwealth,* 201 Va. 209, 110 S.E.2d 252, 254 (1959) (explaining that "parties are husband and wife unless and until the marriage is annulled"). This is arguably in contrast with Title II, Chapter I, Article 95 of Nicaragua law, which on its face makes recordation of the certificate a condition of a valid marriage.

4. At the hearing, as summarized by the examiner, Gibson and El Azar both testified that the purpose of the religious ceremony was merely "to give a sense of security to Kyle, the

son of [the] decedent and [Ms. Gibson]"; both "were adamant in declaring their intention not to have any of the legal entanglements ... associated with marital relationships," and testified that "the reason they did not complete the requirements for a valid marriage in Nicaragua ... was because their intention was not to get legally married."

5. Virginia itself does not recognize common law marriages, but extends "comity to unions 'valid under the laws of the jurisdiction where the common-law relationship was created.'" *Kelderhaus,* 467 S.E.2d at 305 (citation omitted).

lengths to preserve her identity as "Mrs. Gibson" rather than remarry, but nothing in the Workers' Compensation Act precluded her doing so.

■ Petitioners' remaining argument is the procedural one that the hearing examiner erred in considering exhibits belatedly introduced by Gibson on whether Nicaragua would recognize the religious ceremony civilly. The only document of significance, however, was one demonstrating that no record of a marriage between Gibson and El Azar had been found in the Book of Marriages maintained by the relevant Nicaragua court. Because petitioners offered no contrary evidence that the certificate of the religious union had been recorded as required,[6] the examiner was within her discretion in accepting the document as reliable proof of a material fact, whether or not timely submitted. *See* 7 DCMR § 223.4 (1986).

*Affirmed.*

---

**6.** Indeed, as explained, they do not dispute on appeal that the certificate was not registered.