LINCOLN HOCKEY LLC D/B/A
Washington Capitals and Chubb
Insurance Group, Petitioners,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.

Mark Tinordi, Intervenor

No. 01–AA–890.

District of Columbia Court of Appeals.

Argued Sept. 12, 2002.
Decided Nov. 21, 2002.

Stewart S. Manella, with whom Samuel K. Charnoff, was on the brief, for petitioner.

Robert R.Rigsby, Corporation Counsel at the time the statement was filed, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Benjamin T. Boscolo, with whom Gerald Herz, was on the brief, for intervenor.

Before STEADMAN and SCHWELB, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

Lincoln Hockey LLC and Chubb Group (collectively, "Capitals") contend that the Director of the Department of Employment Services ("Director") erred in his construction of the D.C. Workers' Compensation Act, disallowing compensation credit for post-injury/pre-award contract wages paid to Mark Tinordi ("Tinordi"), an injured employee. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Tinordi, claimant/intervenor, is a former professional hockey player for the Capitals, his employer. The Capitals are a member team of the National Hockey League ("NHL") and are petitioners here from the decision of the Department of Employment Services ("DOES"). This petition arises out of a workers' compensation award stemming from an injury sustained by Tinordi in the course of his employment while under a guaranteed contract with the Capitals.

### A. The Collective Bargaining Agreement and the Contract

The contract under which Tinordi played for the Capitals was a standard form con-

tract taken from the collective bargaining agreement ("CBA") between the NHL and the NHL Players' Association ("NHLPA"). The relevant language of the CBA, found in Article 23.4, reads as follows:

A player under contract who is disabled and unable to perform his duties as a hockey player, including travel with his team or on business requested by his Club, shall be entitled to receive his remaining salary due in accordance with the terms of his contract as long as the said disability and inability to perform continue .... In consideration of payment of such salary, as well as payments made by the Club to fund Hospital, Major Medical and Dental Plan, payments made by the Club to provide Career Ending Disability Insurance and other consideration, player does hereby covenant that in the event he files a claim under such Career Ending Disability Insurance (unless such claim is not paid), he personally releases ... the Club [and every other hockey related person from any further liability whatsoever].

This language is incorporated almost verbatim into the NHL Standard Player's Contract ("SPC"), attached to the CBA as Exhibit 1; all NHL players' contracts must be in this form. The specific language of the SPC at issue, found in ¶ 5(d), is as follows:

It is also agreed that if the Player, in the sole judgment of the Club's physician, is disabled and unable to perform his duties as a hockey player by reason of an injury sustained during the course of his employment as a hockey player, including travel with his team or on business requested by the Club, he shall be entitled to receive his remaining salary due in accordance with the terms of this contract for the remaining stated term of this contract as long as the said

disability and inability to perform continue but in no event beyond the expiration date of the fixed term of this contract .... In consideration of payment of such salary, as well as payments made by the Club to fund the Major Medical Plan pursuant to Article 23 of the [CBA], payments made by the Club to provide Career Ending Disability Insurance pursuant to Article 23 of such Agreement and other consideration, the Player does hereby covenant that in the event he files a claim under such Career Ending Disability Insurance (unless such claim is not paid), he personally releases ... the Club [and every other hockey related person from any further liability whatsoever].

This guaranty clause requires the employer to continue to pay Tinordi his salary through the expiration of his contract in the event of an injury sustained in the course of employment, even in the event of a permanently disabling injury. It also allows players to collect insurance proceeds in the event that any injury is career-ending. The amount of the award under the insurance policy is based purely upon the age of the claimant, apparently to take into account the expected career life a claimant would have otherwise enjoyed but for the career-ending injury. By the terms of the contract, any such insurance claim, once paid, would release the employer from any future liability.

### B. The Injury

On the night of February 22, 1999, Tinordi was playing in a game for the Capitals, when he sustained an injury to his right ankle. He broke his talus, a bone in the ankle, which rendered him unable to play. Although it would be discovered after the season had effectively ended that the injury was career-ending,[1] both Tinordi

---

1. Although Tinordi's contract with the Capitals expired on June 30, the season ended for the Capitals on April 15, which was also the last salary payment under the contract.

and the Capitals believed the injury to be a relatively minor one. Accordingly, they expected that after a normal recuperative period, Tinordi would return to play. While the ankle healed, Tinordi continued to report to the team facilities, to attend team meetings, to work out to the extent his injury permitted, and to review film of scheduled opponent teams. All of this he was required to do pursuant to the employment contract.

Throughout, Tinordi continued to collect his salary as the contract provided. Some time later, however, complications arose. The particular bone that had broken is located in a precarious part of the ankle, where damage to the bone can sometimes permanently damage the artery that supplies the bone with blood. Apparently, such damage occurred in Tinordi's ankle, resulting in the talus eventually succumbing to avascular necrosis ("AVN"), the death of bone tissue due to loss of circulation. As a result, in late October 1999, Tinordi underwent bone graft surgery to replace the dead tissue in his ankle. Despite the surgery, the AVN in his ankle rendered him permanently unable to play hockey, thus ending Tinordi's career. After the injury, pursuant to the contract, the Capitals had continued to pay Tinordi his salary through the expiration of the contract, June 30, 1999. The post-injury salary payments totaled $780,208.24. In addition, Tinordi filed a claim against the Career Ending Disability Insurance and received $40,000. He also received $20,000 under a similar insurance policy funded by the NHLPA.

### C. *The DOES Proceedings*

After Tinordi's contract expired, he filed a claim with the DOES seeking benefits arising from the February 22 injury. He sought benefits for temporary total disability effective July 1, 1999, to the present and continuing, and for medical expenses and costs incident to receipt of medical care (*i.e.*, travel and lodging). The Capitals responded by claiming that Tinordi waived any right to benefits under the release inherent in the career-ending disability insurance claim that he made, and alternatively that the post-injury salary payments and the proceeds under both career-ending disability insurance policies should be credited against any possible benefit award.

The Hearing Examiner awarded Tinordi total temporary disability benefits from July 1, 1999, and reimbursement for the medical, travel, and lodging expenses. Additionally, the Hearing Examiner denied the Capitals' claims for credit for the post-injury salary and the $20,000 NHLPA career-ending disability insurance. He awarded, however, credit for the NHL's $40,000 career-ending disability insurance.

The Capitals applied for review by the Director of the DOES. They argued that the Hearing Examiner erred in two respects: (1) the post-injury salary payments should be the basis for credit under the language of D.C.Code § 36–315(j),[2] and (2) the factual findings as to the parties' intent were not supported by substantial evidence on the record. Tinordi responded with a memorandum in opposition to the Capitals' application and with an untimely cross-application, contending that the Hearing Examiner erred in awarding the credit for $40,000. The Director dismissed the cross-application as untimely and affirmed the Examiner's decision. The Capitals seek review in this court, contending that we should review the case *de novo*, that the DOES's statutory interpretation is unreasonable, and that the parties intended the contract wages to be disability benefits.

2. Now recodified at D.C.Code § 32–1515, and hereafter referred to as such.

## II. ANALYSIS

### A. *Standard of Review*

■ This case involves judicial review of an administrative decision that required the agency in question to construe the statute it was administering and to apply that construction to the facts as the agency found them. In such a case, we review findings of fact under the "substantial evidence" test, *Washington Times v. District of Columbia Dep't of Employment Servs.*, 724 A.2d 1212, 1216 (D.C.1999) (citations omitted), and we will defer to reasonable conclusions of law. *Mushroom Transp. v. District of Columbia Dep't of Employment Servs.*, 698 A.2d 430, 432 (D.C.1997) (*"Mushroom I"*). This latter principle was reiterated two years later in a subsequent *Mushroom* case, where we said: "this court defers to an administrative agency's interpretation of the statute that it administers if that interpretation is a reasonable one in light of the language of the statute and its legislative history . . . ." *Mushroom Transp. v. District of Columbia Dep't of Employment Servs.*, 761 A.2d 840, 842 (D.C.2000) (*"Mushroom II"*).

Nevertheless, the Capitals argue that this court should review the DOES's construction of the statute in question *de novo*. As authority for this assertion, they rely upon this court's decision in *The Washington Post v. District of Columbia Dep't of Employment Servs.*, 675 A.2d 37 (D.C.1996). That reliance is misplaced.

■ In *The Washington Post*, we dealt with a situation markedly different from the circumstances in the instant case. There we were faced with a novel administrative interpretation of "total disability" that was inconsistent with a settled one. *The Washington Post, supra*, 675 A.2d at

41. In fact, we specifically pointed out in that case that the settled interpretation—that failure of an employer to offer an otherwise partially disabled employee a "light duty" position does not in itself render the employee's disability "total"—was the product of our deference to the agency's initial interpretation. *Id.* (discussing *Joyner v. District of Columbia Dep't of Employment Servs.*, 502 A.2d 1027, 1031 & n. 4 (D.C.1986)). In other words, the legal standard against which the DOES's ruling in *The Washington Post* was to be gauged was the agency's original, reasonable interpretation, to which we had previously deferred and from which the hearing examiner had deviated. Here, the DOES was presented with a case of first impression: Does payment of wages owing to an employee pursuant to explicit term of contract constitute "advance payment of compensation"? Therefore, we review the DOES's interpretation by the following, settled standard:

> This court will uphold the agency's interpretation of [the District of Columbia Workers' Compensation Act] unless the interpretation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . . We defer to a reasonable construction of the statute made by the agency . . . .
>
> The agency's interpretation of the statute it administers is binding on this court unless it conflicts with the plain meaning of the statute or its legislative history . . . . Indeed, we must sustain the agency's interpretation even if a petitioner advances another reasonable interpretation of the statute or if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance.

*Mushroom I*, 698 A.2d at 432 (brackets in original) (citation omitted).[3]

---

3. In their briefs, the parties direct our attention to the DOES's decision in a related case, *Stuart Anderson v. Pro–Football, Inc.*, Dir. Dkt. No. 88–55, OHA No. 87–301 (March 3,

1995). There, one issue was whether or not the employer was entitled to a credit for monies paid to the employees as injury protec-

## B. *The DOES's Interpretation of Section 32–1515(j)*

The DOES construed the language of Section 32–1515(j) to preclude contract wages paid after an injury but before an award from "advance payments of compensation," for which an employer is entitled to credit against any award. The Capitals contend that this is an incorrect construction of the plain language of Section 32–1515(j), and that it is inconsistent with that section's legislative history. As discussed below, both contentions fail.

### 1. *The Language of Section 32–1515*

As noted above, the Hearing Examiner weighed the parties' arguments regarding the interpretation of Section 32–1515 of the D.C.Code, entitled "Payment of Compensation." As the title implies, that section prescribes the method by which compensation is to be paid by employers to employees who are eligible for benefits. *See* § 32–1515. The specific subsection in question, Section 32–1515(j), reads:

> If the employer has made advance payments of compensation, he shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due. All payments prior to an award, to an employee who is injured in the course and scope of his employment, shall be considered advance payments of compensation.

D.C.Code § 32–1515(j).

Specifically at issue is the import of the second sentence. The Capitals contend that "[a]ll payments" in the context of D.C.Code Section 32–1515(j) dealing with the "advance payments of compensation," as contained in the first sentence, means *all* payments—of any sort. Tinordi, on the other hand, argues that "[a]ll payments"

means only all payments of *compensation*. The importance of this distinction inheres in the definition of "compensation" as defined under the statute. " 'Compensation' means the *money allowance* payable to an employee or to his dependents *as provided for in this chapter*, and includes funeral benefits provided herein." D.C.Code § 32–1501(6) (emphasis added).

The Hearing Examiner reviewed the SPC, the CBA, the parties' arguments, the testimony taken at the hearing, the statute, and the case law, and concluded that the language of the statute was vague and that it could not be construed to allow an employer credit for salary payments made under contractual obligation. (Compensation Order at 6.) He stated, "It would seem reasonable to interpret the language of the statute to apply only to payments made after the date of injury which [sic] employer was not otherwise under a separate obligation to pay." *Id.* He reasoned that, although arguable, the Capitals' position— that the absence of the word "compensation" modifying "all payments" in the second sentence of Section 32–1515(j) requires literally any post-injury payment made prior to an award to a subsequent claimant to be creditable as advance payments—could lead to unreasonable results. *Id.* at 5. He concluded that the statute was not intended to confer credit for extant contractual obligations. In essence, the Hearing Examiner determined that the payments in the second sentence referred to those payments set forth in the first sentence.

On review, the Director of the DOES affirmed. The Director applied the proper standard of review: "[The Director] must affirm the Compensation Order under re-

tion and/or injury grievance payments. The DOES found those payments to be similar to sick leave benefits, which are creditable. *See Buckley v. Wells Fargo Guard Servs.*, H & AS No. 85–33, OWC No. 0055502 (November 29, 1985). The DOES's decision in the instant case is not inconsistent with its decision in *Stuart Anderson.*

view if the findings of fact contained therein are supported by substantial evidence in the record considered as a whole and the law has been properly applied." *Id.* at 3 (citing D.C.Code § 36–322[4] and D.C. Mun. Regs. tit. § 7–230). It is that decision that we review.

As a basic principle, "when the language of a statute is plain and unambiguous, we are bound by the plain meaning of that language." *Hudson Trail Outfitters v. District of Columbia Dep't of Employment Servs.,* 801 A.2d 987, 990 (D.C. 2002) (citation omitted). "However, 'even where the words of a statute have a "superficial clarity," a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve.' " *Hively v. District of Columbia Dep't of Employment Servs.,* 681 A.2d 1158, 1161 (D.C.1996) (citation omitted). In that event, this court will "look to policy and the statute's 'manifest purpose' in order to assist" in the interpretation of ambiguous statutory language. *Hively, supra,* 681 A.2d at 1163. The Capitals argue that there is no such ambiguity.[5] We disagree.

The Workers' Compensation Act ("WCA") is a statutory regime instituted to facilitate the compensation of workers who have been injured on the job. *See id.* Specifically, "workers' compensation statutes are to be liberally construed for the benefit of the employee." *Id.* (citations omitted). Looking thus to the statute in question with that principle in mind, a statute entitled "Payment of Compensation" whose superficially clear language confers payment credit against employee

award benefits upon an employer for all payments, even salary payments that he is contractually bound to pay, a conclusion that the language is ambiguous is not only reasonable, but also arguably required. Further, the manner in which the DOES interpreted the ambiguity comports well with the purpose of the statute from which that ambiguity was reasonably gleaned.

The Capitals call our attention to our decision in *Gay v. Dep't of Employment Servs.,* 644 A.2d 1326 (D.C.1996), which they contend is inconsistent with the decision in this case. We disagree. In *Gay,* the DOES denied a bus driver's claim for temporary total disability benefits under the compensation statute because he had received sick leave benefits equal to his full pay from his employer. We held that the DOES had not adequately expounded its statutory analysis "in light of the facts of th[e] case and the broader considerations presented by the issue." *Id.* at 1328 (citing *Ward v. Anderson,* 93 U.S.App. D.C. 156, 159, 208 F.2d 48, 50 (1953)). In doing so, we said:

> [I]f a certain type of payment prior to an award under the Act is determined to be an advance payment of compensation, any payment up to that amount under the Act would be immediately recoverable by the employer as reimbursement, and the employee effectively recovers nothing in the circumstances presented here.

*Gay, supra,* 644 A.2d at 1326 (emphasis added) (footnote omitted). We remanded for reconsideration. If only a "certain type" of payment might qualify for credit, then "all payments" may contemplate

---

4. Recodified as D.C.Code § 32–1522.

5. The Capitals also argue that a determination that the salary paid here is not creditable under paragraph (j) would undermine employers' incentive to continue to pay wages

pending a compensation award. To the contrary: the Capitals and other similarly situated employers have more than mere incentive to continue to pay; they have contractual duties.

something less than absolutely all payments.

■ The conclusion that Section 32–1515 does not provide setoff credit for post-injury, pre-award salary payments made pursuant to contract does not appear to be inconsistent with the plain meaning of the statute.

### 2. *The Legislative History*

The Capitals assert that the DOES's interpretation is counter to the statute's legislative history. We repeat, "this court defers to an administrative agency's interpretation of the statute that it administers if that interpretation is a reasonable one in light of the language of the statute and its legislative history . . . ." *Mushroom II, supra,* 761 A.2d at 842. The Capitals note that the current WCA replaced the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.; Hively,* 681 A.2d at 1162. As we have stated on another occasion, the D.C. Council intended with the enactment of the WCA to "narrow the scope of coverage as well as the amount of compensation" available to disabled employees. *Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567, 570 (D.C.1985). The prior statute read: "If the employer has made advance payments of compensation, he shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due." 33 U.S.C. § 914. Wholly absent from the prior statute is the second sentence of the current statute, which is the sentence in contention.

However, the addition of that single sentence in question in and of itself does not mean that "all payments" was intended to include payments of money under obligations already accrued. The context in which the need to narrow the scope of the workers' compensation regime arose is of doubtful relevance to the instant case: The prior regime

extended compensation coverage to an employee of an employer "carrying on any employment in the District of Columbia" without regard to where the employee worked or was injured. The Supreme Court had construed this statute as giving the widest extraterritorial application coverage possible consistent with the Due Process Clause of the Constitution.

*Hughes, supra,* 498 A.2d at 569 (footnote and citations omitted). The D.C. Council was concerned about its ability to attract or to keep businesses because of its inability to compete with neighboring jurisdictions' workers' compensation costs, *id.* at 569–70; the primary concern was with the territoriality of the older regime. The costs were as high as they were because of the geographical scope of the prior statute. Because "workers' compensation statutes are to be liberally construed for the benefit of the employee," *Hively, supra,* 681 A.2d at 1163, and the principally geographic concerns that prompted the Council to circumscribe the scope of employer liability, we remain unpersuaded that the DOES's construction of Section 32–1515 is inconsistent with that section's legislative history.

This conclusion is consistent with *Gay.* As discussed above, the *Gay* court discussed the principle that some payments of sick pay could be found to constitute advance payments of compensation, and that others might not. *Gay, supra,* 644 A.2d at 1327. Note that the *Gay* court did not decide that that is the appropriate construction of the sentence at issue, *id.* Instead, the court spoke of the language of a prior case in terms of supporting the proposition that, "between the positions of allowing sick pay as a credit to the employer in every situation and of never allowing a credit, a possible middle ground exists which would allow a credit in certain cases . . . ." *Gay, supra,* 644 A.2d at 1327 (discussing *Buckley v. Wells Fargo Guard*

*Servs., Inc.,* H & AS No. 85–33, OWC No. 0055502 (Nov. 29, 1985)).

In conclusion, the DOES's reasonable interpretation of the statute in question is not inconsistent with its plain meaning or its legislative history.[6]

### C. *The Factual Findings*

 The Capitals contend, in addition to their assertion of an incorrect legal ruling, that the DOES erred in its finding that the post-injury payments under the contract constituted salary, as opposed to disability compensation. We reiterate our deferential "substantial evidence" standard employed in reviewing findings of fact. If the record, when viewed as a whole, provides substantial evidence upon which a given decision could rationally be based, that given decision will stand. *Washington Post Co. v. District Unemployment Comp. Bd.,* 377 A.2d 436, 439 (D.C.1977). " 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' *Stewart v. District of Columbia Dep't of Employment Servs.,* 606 A.2d 1350, 1351 (D.C.1992) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

The Examiner articulated, and the Director endorsed, four essential findings that served as a basis for decision: (1) the parties' ignorance of the extent of the injury until well after the expiration of the SPC; (2) the guaranteed nature of what both the SPC and the CBA characterize as "salary"; (3) the post-injury duties Tinordi had and continued to fulfill under the SPC; and (4) the fact that, for myriad possible reasons, a professional athlete employee may periodically fail actually to compete, yet nevertheless, "he still remains 'employed' by the team, in any meaningful sense of the word." These findings are uncontroverted in the record. The Examiner therefore found that "the payments to [Tinordi] were regular salary payments which [the Capitals were] obligated to make irrespective of [Tinordi's] injury status, and were not 'compensation,'advance [sic] or otherwise, within the meaning of the Act."

### III. CONCLUSION

The DOES's decision is based upon reasonable statutory construction and substantial evidence in the record when viewed as a whole. The construction of the second sentence of section 32–1515(j) is not inconsistent with its plain meaning or its legislative history. As for the findings of fact, the record contains more than sufficient evidence that the money paid to Tinordi after his injury was salary, or wages. The decision of the DOES excluding contract wages from the purview of section 32–1515 and upholding the factual finding that the guaranteed post-injury payments in the instant case constitute such contract wages, thereby denying the

---

6. The Capitals contend that the parties intended the guaranteed salary to constitute "compensation" within the meaning of section 32–1515(j). The DOES rejected that contention, as do we. First, such an intent is contrary to section 32–1516(b) (prohibiting parties from waiving rights under the WCA). *McGough v. Kiewit Kenney,* OHA No. 97–558A, OWC No. 278162 (December 15, 2000). Second, even were such waiver permissible, the Capitals' argument that the parties intended that the guaranteed salary serve as some sort of disability insurance is discredited by the deposition testimony of Mr. Ian Pulver, associate counsel for the NHLPA's labor department. There Mr. Pulver testified that during the negotiations for the CBA, the NHL tried to insert language that would have achieved the exact results it seeks here, and that the NHLPA specifically rejected it. No such provision or language was thus to find its way into either the CPA or the SPC.

Capitals' claim for compensation credit, is affirmed.

*So ordered.*