Margo BANSDA, Appellant,

v.

Jeffrey WHEELER, Appellee.

In re Olekanma Ekekwe, Appellant.

Nos. 08–FM–126, 08–FM–192 and 09–FM–465.

District of Columbia Court of Appeals.

Submitted March 3, 2010.

Decided May 13, 2010.

190

Margo Bansda, pro se.

Lynn H. Johnson, Washington, DC, was on the brief for appellee.

Olekanma Ekekwe, pro se.

Before FERREN, STEADMAN, and KING, Senior Judges.

FERREN, Senior Judge:

In this consolidated appeal, Margo Bansda appeals from a judgment of absolute divorce from appellee, Jeffrey Wheeler, issued on November 5, 2007, ordering property distributions and declining separate maintenance pursuant, respectively, to D.C.Code §§ 16–910(a) & (b), –913(d) (2001). Bansda also appeals from the November 5, 2007 order holding her in contempt for violating the court's June 5, 2007 order requiring her to pay Wheeler $1,300 in rent for each month that she remained in Wheeler's house. Appellant Olekanma Ekekwe, Bansda's former attorney, appeals the trial court's March 30, 2009 denial of her February 21, 2008 motion for reconsideration of the court's January 18, 2008 order imposing sanctions against her in the form of $1,360 in attorney's fees payable to Wheeler for failing to comply with discovery deadlines. We affirm the trial court's contempt order against Bansda, as well as the final divorce order declining separate maintenance for Bansda and dividing and distributing the real and personal property of the parties. We also affirm the denial of Ekekwe's motion for reconsideration of the court-ordered sanctions.

I.

The appellant, Bansda, a citizen of South Africa, and the appellee, Wheeler, a citizen of the United States, were lawfully married in the District of Columbia on April 28, 2001. Beginning in 1998 or 1999, while Bansda and Wheeler were living in the Netherlands, they began to discuss the possibility of marriage and starting a family. Wheeler had moved to the Netherlands in the fall of 1999 to be with Bansda, and while he was there the couple registered as domestic partners with the Immigration Department and lived together and shared expenses.

The couple eventually left the Netherlands and relocated to Virginia for several months. They became engaged and, on January 31, 2001, began living together in the District of Columbia in a house at 119 Rittenhouse Street, N.W., that Wheeler had purchased in December 2000. Although Bansda helped select the property and the couple discussed purchasing the house together, ultimately Wheeler made the down payment on the home, made all of the mortgage payments, and was the only person whose name was on the title. The couple lived on Rittenhouse until February 2002, when they moved to Zambia for Wheeler's employment, living there until 2004 when they moved to South Africa.

The parties separated around July 1, 2005, while living in Johannesburg, South Africa. Wheeler moved back to the District of Columbia with the intention of terminating the marriage. Bansda remained in South Africa but continued to talk with Wheeler about the possibility of reconciling. Wheeler, however, refused. Sometime in November 2005 Bansda agreed to end the relationship but indicated that she wanted to do so in person. She returned to the Rittenhouse property and refused to leave. Because of her refusal, Wheeler moved out of Rittenhouse. While Bansda was living there, Wheeler continued to make full mortgage payments without being able to rent out the house to help with the payments.

On May 4, 2006, Wheeler filed a complaint for divorce on the ground that the parties had been mutually and voluntarily living separate and apart for six months.[1]

1. On December 12, 2006 the court granted Wheeler's motion to file a supplemental and

In her counter-complaint, Bansda alleged that as a result of their relationship in the Netherlands, the parties had entered into the equivalent of a common law marriage before their formal marriage ceremony in April 2001. She also alleged that she owned an interest in Rittenhouse because, although Wheeler had persuaded her not to put her name on the title, she understood that she was to be co-owner of the house. She requested use and possession of the property, among other things.

Trial began on December 13, 2006 and continued intermittently until September 17, 2007. In the meantime, in response to a motion by Wheeler, the trial court ordered Bansda on June 5, 2007 either to vacate Rittenhouse or to begin paying Wheeler $1,300 per month for each month that she lived there—an order with which she never complied before the court, on November 5, 2007, issued its final divorce decree and written rulings on a number of outstanding motions, including its ruling holding Bansda in contempt for failure to vacate or pay rent.

## II.

Wheeler argues that Bansda's appeal is untimely and that this court therefore lacks jurisdiction to proceed on the merits. On November 14, 2007, nine days after the trial court rendered its November 5 judgment, Bansda filed "Defendant's Request for Reconsideration" pursuant to Super. Ct. Dom. Rel. R. 7, 60, and 62. On January 18, 2008, the trial court denied the

motion but did not determine whether it fit under Rule 59 or Rule 60.

■ Wheeler argues that Bansda's notice of appeal, filed on February 7, 2008, was late-filed "ninety-four days after the entry of judgment," thus failing to comply with D.C.App. R. 4(a)(1), which requires a notice of appeal to be filed in a civil case within thirty days of the judgment date. Wheeler acknowledges that certain types of interim orders will toll the time for filing a notice of appeal, but he argues that Bansda's motion does not qualify. Contrary to Wheeler's contention, however, we conclude that Bansda's motion tolled the time to appeal pursuant to D.C.App. R. 4(a)(4)(A).[2]

■ We note, first, that Bansda's caption for the motion, a "request for reconsideration," is not among those specified in the Superior Court's Domestic Relations rules. Nonetheless, "[t]he nature of a motion is determined by the relief sought, not by its label or caption." *Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801, 804 (D.C.1984). Bansda sought relief from the judgment by alleging both mistakes of fact and an erroneous application of law. As to facts, she argued that the trial court had erred in computing her net assets by referencing dollars rather than rands and by including in the calculus retirement assets to which she did not yet have access. Claiming an error of law, she asserted that, when making its property distribution and alimony determinations, the court had erroneously failed to take

amended complaint.

**2.** (4) *Effect of a Motion on a Notice of Appeal.* (A) If a party timely files in the Superior Court any of the following motions under the rules of the Superior Court, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion: (i) for judgment as a matter of law; (ii) to amend or make additional factual find-

ings, whether or not granting the motion would alter the judgment; (iii) to vacate, alter, or amend the order or judgment; (iv) for a new trial; or (v) for relief from a judgment or order if the motion is filed no later than 10 days (computed using Superior Court Rule of Civil Procedure 6(a)) after the judgment is entered.

into adequate consideration the financial hardship imposed on her by her attempts to start a new business, the inconsistent nature of her employment, and her difficulty adjusting to life in the United States.

Because Bansda asserted mistakes both of law and of fact, her motion could properly fall under both Rules 59 and 60, respectively. *See, e.g., Amatangelo v. Schultz,* 870 A.2d 548, 553 (D.C.2005) ("Generally speaking, if the motion seeks reconsideration of an order because of a mistake of fact or a change in circumstances, it is properly considered under Rule 60(b), 'but if the movant is seeking relief from the adverse consequences of the original order on the basis of error of law, the motion is properly considered under Rule 59(e).' ") (quoting *Wallace,* 482 A.2d at 804). Moreover, Rule 59 motions and Rule 60(b) motions filed within ten days of the judgment operate to toll the time for filing a notice of appeal. D.C.App. R. 4(a)(4)(A)(iii), (v); *see also Nichols v. First Union Nat'l Bank,* 905 A.2d 268, 271–72 (D.C.2006). Because Bansda's motion contained elements that qualify under these rules, that timely-filed motion served to toll the appeal period until the trial court ruled on it. And because Bansda filed her appeal on February 7, 2008, within thirty days of the court's January 18, 2008 order disposing of her motion, her appeal was timely. *See* D.C.App. R. 4(a)(4)(A).

## III.

The trial court ruled that (1) Bansda was in contempt of its June 5, 2007 order to pay Wheeler $1,300 per month in rent for living at Rittenhouse; (2) Bansda and her former counsel, Ekekwe, were liable to Wheeler for $1,460[3] in attorney's fees for failure to comply with Wheeler's discovery requests; (3) Bansda was not entitled to exclusive use and possession of Rittenhouse or to an equitable interest in the property; (4) there should be no equitable distribution of Wheeler's assets to Bansda; and (5) Wheeler was to receive the dining room table, chairs and matching bench, and gardening tools, whereas the parties' personal property located in a container in South Africa would be divided by a special master.

On appeal, Bansda contends that the trial court erred by (1) ruling that the parties did not have a common law marriage; (2) failing to conduct a detailed evaluation of all finances before issuing its final decision; (3) entering premature injunctive relief to Wheeler in the form of rental payments; (4) holding Bansda in contempt for failing to make timely rental payments to Wheeler; (5) failing to hold a pretrial conference; and (6) adopting the Findings of Fact and Conclusions of Law submitted by Wheeler. Bansda also contends that the trial judge should have recused himself because he knew her former counsel outside the four corners of the courtroom.

Appellant Ekekwe appeals the court's imposition of sanctions against her for failing to comply with opposing counsel's discovery requests.

### A. Contempt Ruling

 Civil contempt orders are reviewed for abuse of discretion. *Wagley v. Evans,* 971 A.2d 205, 210 (D.C.2009). "For the trial court to issue a civil contempt

---

3. The court's November 5, 2007 order indicates that the sanction amount is $1,460, which is the amount requested by Wheeler's attorney. However, in its January 18, 2008 order, the court indicates that the amount requested was $1,360 and in its March 20, 2009 Order Denying Motion to Reconsider, the court orders Ekekwe to pay $1,360. On appeal, all parties appear to agree that the sanction awarded against Ekekwe is $1,360.

order, the movant must make a clear and convincing showing that (1) the alleged contemnor is subject to a court order, and that (2) he or she has failed to comply with that order." *Id.* The trial court twice adjudicated Bansda in contempt, first for violating its June 5, 2007 order requiring her to pay Wheeler $1,300 per month in rent for residing at Rittenhouse and, second, for violating a November 5, 2007 order to vacate the property within thirty days of its ruling.

On May 24, 2007 Bansda moved to continue the trial and represented to the court that Wheeler had consented to the motion. The court granted the motion, whereupon Wheeler filed·a motion to hold Bansda in civil contempt, arguing that he was "prejudiced by any delay because he loses rental income from his house the longer Defendant remains in the house without paying rent." The court found that Bansda had misrepresented Wheeler's consent to the continuance, that the delay was Bansda's fault, that she should shoulder the burden of the delay, and that she was required to pay Wheeler $1,300 on the first day of any month she resided in the property from the date of the order. This gave Bansda the option of either moving out or paying rent to Wheeler.

Bansda argues that the June 5, 2007 order was an abuse of discretion because the trial court had not yet heard evidence about Bansda's financial status; because she, in fact, could not afford to make the rental payments; and because "the key issue of Bansda's equitable interest [in Rittenhouse] remained to be litigated." She appears to be arguing on appeal that because the June 5 order was invalid, the November 5 contempt finding was also an abuse of discretion. Bansda also contends that Wheeler was not entitled to the "extraordinary relief" of a "Writ of [Attachment]" that resulted in the garnishment of Bansda's funds when she refused to pay the $6,500 in back rent that the court found she owed Wheeler in its November 5 order. Citing Super. Ct. Dom. Rel. R. 69(a)(2), and D.C.Code § 16–920, Bansda argues that both remedies were premature because her motions for stay and for reconsideration of the November 5, 2007 order were still pending when the writs were issued, and because there was no final judgment of divorce.

Finally, Bansda claims that the court erred when, on February 20, 2008, it granted Wheeler's January 15, 2008 contempt motion and sentenced her to forty-five days of incarceration without granting the option of purging her contempt.

■■■ "Compliance with court orders is required until they are reversed on appeal or are later modified." *Baker v. United States,* 891 A.2d 208, 212 (D.C.2006). Thus, even if the court's June 5, 2007 order was invalid, Bansda's conviction for contempt must be upheld for her failure to comply with the order to vacate the Rittenhouse property or to pay rent to Wheeler in the amount of $1,300 per month. *See id.; In re Evans,* 411 A.2d 984, 993 n. 10 (D.C.1980) ("As a general rule, violations of an order are punishable as criminal contempt even though the order is set aside on appeal." (internal quotation marks and citation omitted)). This rule applies to cases of civil, as well as criminal, contempt. *See generally Cummings–Landau Laundry Machinery Co. v. Koplin,* 386 Ill. 368, 54 N.E.2d 462 (1944).

Before the court held Bansda in contempt for violation of its June 5, 2007 order it held a hearing to determine whether Bansda had the financial ability to pay the amount she owed. She indicated at the hearing that she could afford to pay $500 per month, but she did not say that she had attempted to find housing at this rate. In its November 5 order, the trial

court found that Bansda had failed to prove by a preponderance of the evidence that she was unable to pay the $1,300 monthly rent and had remained in the Rittenhouse property. We perceive no error.

■ Bansda's other contentions lack merit. She appears to argue that because she had applied for a stay of the court's November 5, 2007 divorce order, the court's contempt finding on that day, as well as the court's orders that she purge the contempt by paying $6,500 in back rent and vacating Rittenhouse within thirty days, did not become immediately effective. She relies on D.C.Code § 16–920, which states that if a party applies for a stay, a judgment for absolute divorce does not become effective until entry of the court's order denying a stay. *See id.* The court denied the stay several days after the writ of attachment had been filed against her bank accounts to secure payment of the rent arrearages due Wheeler. But, as the court noted at its February 20, 2008 hearing on the motion to quash the writ, Bansda had been adjudged in contempt of the court's June 5, 2007 order on November 5, 2007 and had a duty to pay Wheeler the rental amounts she owed him as soon as she was held in contempt. Because she did not do so, there was nothing prohibiting Wheeler from lawfully seeking a writ of attachment to secure payment pursuant to the court's contempt order.

■ Finally, although the court sentenced Bansda to a forty-five day period of incarceration, contrary to the assertion in her brief, the court suspended the sentence and gave her the opportunity to purge her contempt, in order to avoid incarceration, by moving out of Rittenhouse by February 29, 2008. In her brief, Bansda asserts that she had in fact vacated the premises on time and that she had turned the keys over to Wheeler's counsel. Even

if she had served the forty-five day sentence, and even assuming for argument's sake that the sentence had been unlawful, this court could provide no remedy for an illegal sentence for civil contempt already fully served, and thus the appeal on this issue is moot. *See, e.g., Holley v. United States,* 442 A.2d 106, 107 (D.C.1981) ("Where, as here, a judgment has been fully executed, and an appellate decision will not affect the rights and duties of the litigants, there is no longer a live controversy, and the appeal must be dismissed as moot.").

### B. Division of Real and Personal Property

■ We review the trial court's distribution of marital property in a divorce proceeding for abuse of discretion. *Lewis v. Lewis,* 708 A.2d 249, 254 (D.C.1998). "This court has consistently applied the well-settled principle that the trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce." *Young-Jones v. Bell,* 905 A.2d 275, 277 (D.C.2006) (quoting *Barnes v. Sherman,* 758 A.2d 936, 939 (D.C.2000)). As long as the trial court considers the relevant statutory factors "in a manner that is equitable, just and reasonable," we will not disturb its conclusions on appeal. *Id.*

### 1. Common Law Marriage

Many of Bansda's complaints on appeal concern the court's division of property, a division arguably affected by the court's ruling that there was no common law marriage between Bansda and Wheeler before the April 28, 2001 ceremonial marriage in the District. Because of that ruling, the court concluded that Rittenhouse, acquired by Wheeler in December 2000 (and titled solely in his name) was not marital property subject to equitable division. As elabo-

rated below, we conclude that the trial court did not err in refusing to accept Bansda's claim that she and Wheeler had entered into a common law marriage, first in the Netherlands and then in Virginia; the court properly determined that neither jurisdiction recognizes common law marriages.

During argument on the common law marriage claim, Bansda's counsel maintained that the marriage began in 1999 in the Netherlands when the parties held themselves out as husband and wife under that country's Domestic Partnership Act. Counsel argued that this was "the equivalent of a common law marriage in the Netherlands." Wheeler countered that Dutch law is civil law, that the Netherlands is not a common law jurisdiction, and that even if registered domestic partners could establish the equivalent of an American common law marriage there, Wheeler and Bansda never registered their partnership. The court ruled that no common law marriage had been established in Holland or Virginia, two jurisdictions that, according to the court, do not recognize common law marriage. The court added—contrary to Bansda's trial testimony—that the couple did not hold themselves out as married between January 2001, when they moved into Rittenhouse, and April 2001, when they finally married in the District.

 For the reasons provided by the trial court, Bansda cannot establish a common law marital relationship during the period before January 2001 when the parties lived in the Netherlands and in Virginia before moving to the District. The validity of a marriage is to be determined by the law of the jurisdiction where the marriage occurred. *See De Liedekerke v. De Liedekerke*, 635 A.2d 339 (D.C.1993). As Bansda acknowledged, the parties did not register their domestic partnership with the Dutch government while living in

the Netherlands. Nor does she contest Wheeler's position that the law of the Netherlands is civil law, and thus that common law marriage does not exist there. The trial court observed that "[t]he defendant seemed to be unaware that common-law marriage is a creation of the English common-law," and that "the defendant sought to establish a common-law marriage in Holland, certainly not a common-law[ ] jurisdiction." After living abroad, but before moving to the District, the couple lived in Virginia. However, Virginia also does not recognize common law marriage. *Hudson Trail Outfitters v. District of Columbia Dep't of Employment Servs.*, 801 A.2d 987, 992 n. 5 (D.C.2002). Thus, any time period prior to the parties' January 2001 relocation to the District could not be considered in determining the validity of Bansda's common law claim.

 Turning to the four months in 2001 between the parties' relocation to the District (January) and their ceremonial marriage (April), we are aware that the District of Columbia does recognize common law marriage. *Coates v. Watts*, 622 A.2d 25, 27 (D.C.1993). However, "[s]ince ceremonial marriage is readily available and provides unequivocal proof that the parties are husband and wife, claims of common law marriage should be closely scrutinized...." *Id.* Proof of cohabitation alone will not suffice to prove the existence of a common law marriage. *See id.* Instead, the proponent of the marriage must show that the parties cohabitated as husband and wife, following an express mutual agreement, which must be words of the present tense. *Id.* In this case, therefore, Bansda was required to prove by a preponderance of the evidence that there was a valid common law marriage. *See East v. East*, 536 A.2d 1103, 1106 (D.C.1988). She was unable to do so.

Bansda was the only witness to testify on her behalf about the purported common law marital relationship. Although Bansda's counsel attempted to proffer to the court how two additional witnesses would testify at a later time, in order to establish the common law relationship, counsel was not able to proffer with any specificity and seemed uncertain about the ability of these witnesses to provide the necessary facts to satisfy the elements of common law marriage. Moreover, Bansda's testimony focused largely on the parties' attempts to research surrogacy. The court pointed out that many unmarried partners have children in the District, and that this does not mean that these couples intend to hold themselves out as married. Finally, on cross-examination Bansda admitted that she and Wheeler did not open any joint bank accounts until after they were married in April 2001. The court ultimately concluded that the parties had not entered into a common law marriage before the April 2001 ceremonial marriage.

In her brief on appeal, Bansda argues that Wheeler "fully intended to marry her because they were in love," and that while living in Virginia "the parties intended to buy a house together and marry in early 2001." These statements may be true; however, an intent to marry someday does not establish the existence of a common law marriage. If anything, it tends to suggest the opposite by showing that the parties, for whatever reason, were not ready to be legally married until they married in April 2001. In addition, Wheeler's testimony provides evidence that the couple did not hold themselves out to the community as husband and wife before April 2001. He states that his relationship with Bansda was "rocky" in December 2000 when he purchased Rittenhouse, and that "it wasn't clear that [they] were in fact going to get married." This testimony weighs heavily against the existence of a common law marriage, and the court did not err in rejecting the common law marriage claim.

### 2. Exclusive Use and Possession of Rittenhouse

The court determined that Rittenhouse was Wheeler's separate property. The court then rejected Bansda's request for exclusive use and possession of the property. The court held that there was "no basis in law or fact warranting exclusive use and possession of the Rittenhouse Property to the defendant." The court also observed that, although it need not consider Bansda's economic and educational status, Bansda did not show that she was unable to obtain adequate housing on her own; rather, "[s]he is an educated person with experience in the television industry and in business." This determination was not an abuse of discretion where D.C.Code § 16–910(a) requires the court to "assign to each party his or her sole and separate property acquired prior to the marriage."

### 3. Equitable Distribution of Rittenhouse

The court then considered whether Bansda had an equitable interest in the Rittenhouse property and decided that she did not. The court noted that in some instances, "property may be subject to being encumbered by an equitable lien in favor of ... the non-purchasing spouse." In *Yeldell v. Yeldell*, 551 A.2d 832 (D.C. 1988), we acknowledged that "a divorce court, exercising its general equity power, could apportion individually owned property, but in order to do so, 'the court was required to find that the nontitled spouse had a legal or equitable interest in the property.'" *Id.* at 834 (quoting *Hemily v. Hemily*, 403 A.2d 1139, 1142 (D.C.1979)). The only way for a nontitled spouse to

establish such an equitable interest is by showing that she made substantial contributions to the home. *Id.*

■ The trial court found that Bansda contributed only $3,000 for repairs to the home and did not contribute toward capital improvements, while Wheeler paid the monthly mortgage and other taxes and charges on the house. In *Yeldell,* we held that Mr. Yeldell had an equitable interest in his ex-wife's house in large part because he had contributed approximately $50,000 to pay the mortgage on the home, twice the amount that Mrs. Yeldell paid to purchase the property. 551 A.2d at 833. We noted that although Mr. Yeldell's contributions were of marital funds under § 16–910(b) and not separate funds under § 16–910(a), he was still entitled to an equitable share in the house because *he* made the monthly payments from *his* marital earnings. *Id.* at 834 n. 4. Bansda's contributions were far less substantial than those of Mr. Yeldell. Not only did Wheeler purchase the house, but he made the majority of the mortgage payments from his earnings, both separate and marital. The rest of the mortgage payments came from rental income. Wheeler testified that the contract sales price of the Rittenhouse property was $270,000. He also testified that he had made payments on the house in the amount of $151, 699. This figure is far more substantial than the amount contributed by Bansda for repairs.

Bansda also argues that she furnished and maintained Rittenhouse, cleaned the home, clothes, and car, and prepared the meals, but the court found that there was no evidence of any homemaker contributions by Bansda, a finding we see no basis for rejecting. In *Ealey v. Ealey,* 596 A.2d 43 (D.C.1991), we upheld a trial court's denial of an equitable interest in the residence where the appellant, Ms. Ealey, alleged that she had contributed a substantial amount to the home as a homemaker, by cleaning, cooking, conducting daily chores, and providing home maintenance and repair. *Id.* at 47–49. We noted that "[s]ince the judge considered all possible homemaker contributions, he cannot be held to have abused his discretion for viewing homemaker contributions too narrowly." *Id.* at 49. Bansda contends, however, that the trial court improperly curtailed her testimony on her homemaker contributions in order to speed the trial along. However, the record reveals otherwise. It indicates that the trial court did not improperly preclude her from discussing her homemaker contributions. Likewise, Bansda's attorney cross-examined Wheeler about the contributions Bansda made in both furnishing the property and obtaining renters.

As Wheeler notes in his brief, Bansda now attempts to rely on evidence that was never introduced at trial to substantiate her claim, and we will not consider evidence introduced for the first time on appeal. *See Fisher v. Sinrod,* 197 A.2d 846, 847 (D.C.1964) ("[W]e must consider the case as we find it from the record of the trial."). Moreover, while the appellant in *Ealey* had rendered her homemaker services for twenty-three years, *Ealey,* 596 A.2d at 45, the trial court observed that Bansda and Wheeler were married for only five years and had lived together in the home for less than two years. This short amount of time provides additional support for the trial court's conclusion that Bansda's homemaker services did not entitle her to an equitable lien on the property. There was no abuse of discretion.

### 4. Division of Personal Property

After determining that Bansda did not have a legal or equitable interest in the real property, the court divided the rest of the marital and non-marital property.

Bansda maintains that she was entitled to the value of the household appliances and to the value of rental income paid to Bansda and Wheeler during the marriage. She further contends that her contributions to the house helped attract renters. Bansda's counsel made similar points during closing argument, stating that the parties had bought household appliances together, which should be divided between the two as marital property, and that the money they earned from renting the property should be divided as well.

Wheeler testified that he and Bansda had rented out the house to a group of men for $2,050 per month. He further testified that he had received some rental payments from January 2002 through December 2005, and that he had put those payments toward the mortgage. Pursuant to D.C.Code § 16–910(b), the rental income, which originally was paid into a joint account and had accumulated during the marriage, was marital property subject to equitable distribution. Bansda alleges that Wheeler had closed the joint account and moved all of the rental income into a personal account. The court subsequently ruled, however, that Wheeler was entitled to all of the marital assets in his personal possession.

Bansda may have had a claim to the rental income as marital property received between 2002 and 2005, had substantial funds remained in Wheeler's personal account at time of trial. We conclude, however, that the trial court did not abuse its discretion in failing to consider this argument, made on the final day of trial. The record reveals that any rental money had been exhausted to pay the mortgage on the house and that this rental income covered less than half of the total amount that he paid on the mortgage,[4] that Wheeler had received very little rent during the time that Bansda refused to vacate Rittenhouse, and that Wheeler was forced to pay the majority of the mortgage from his personal income, without help from Bansda.

The division of marital property in the form of "arts and gifts," as well as household furniture, also arose during closing argument. The trial judge informed the parties that he would need a list of all "arts and gifts and household furniture" in order to divide and distribute the property pursuant to D.C.Code § 16–910(b). Bansda indicates in her brief that she was not refunded any of the money that she spent on household appliances. The trial court, however, awarded her all the personal property located at Rittenhouse except for the dining room table, chairs and matching bench, and the gardening tools. There is no basis for a refund to Bansda for the household appliances, as they were clearly awarded to her.

Finally, Bansda argues, in broad and conclusory terms, that the trial court miscalculated the "parties' marital and non-marital funds and property, including pensions." She indicates that she corrected the court's figures in a sworn affidavit presented to this court. This affidavit, however, is not a part of the record evidence submitted to the trial court, and we cannot consider it for the first time on appeal.

---

4. Wheeler testified that during the time that he owned the house he paid a total of $151,699 on the mortgage and that only about $71,847 of this amount came from rental income. He paid $24,405 from his separate funds under § 16–910(b) and $55,447 from his marital funds under § 16–910(a). We note that the fact that some of his contributions were of marital funds does not undermine the fact that he paid the mortgage, nor does it give Bansda an equitable interest in the property. *See Yeldell,* 551 A.2d at 834 n. 4.

■ The trial court relied largely on Wheeler's testimony and the plaintiff's exhibits to calculate the parties' marital and pre-marital funds. The court noted that it was difficult to assess the current or recent value of Bansda's assets because she had repeatedly failed to comply with discovery requests. Therefore, the court calculated values to the best of its ability, making the appropriate credibility determinations when necessary. *See Joiner–Die v. United States,* 899 A.2d 762, 764 (D.C.2006) ("In a bench trial, the judge, as fact finder, has the right to make credibility determinations, weigh the evidence, and draw reasonable inferences of fact."). In this non-jury trial, we will not set aside the court's factual findings where there is evidentiary support for these findings and where they are not clearly erroneous. *See Malik Corp. v. Tenacity Group, LLC,* 961 A.2d 1057, 1060 (D.C.2008). This is especially true where, as here, "[t]he evidence presented to the trial court [must] be viewed in the light most favorable to the prevailing party." *Id.*[5]

## C. Judicial Bias

Bansda contends that the trial judge should have recused himself because he knew her second counsel, Ms. Edwards, outside the four corners of the courtroom. Bansda does not offer any factual information in support of this contention beyond the fact that the judge mistakenly referred to Ms. Edwards as Ms. Thornton several times throughout the course of the trial. Bansda claims that this, coupled with the "mini-debates" that occurred between her counsel and the judge, reveals a bias on the part of the trial judge against Bansda and her case.

■ An appearance of bias or prejudice on the part of a trial judge "requires recusal if it is sufficient to raise a question in the mind of the average citizen about a judge's impartiality." *Mayers v. Mayers,* 908 A.2d 1182, 1190 (D.C.2006) (citation and internal quotation marks omitted). Super. Ct. Dom. Rel. R. 63 governs judicial recusal in domestic relations proceedings. Rule 63(b) provides for the recusal of a judge who is biased or who has some other conflict of interest, such as personal knowledge of the facts of a case or association with a litigant. Super. Ct. Dom. Rel. R. 63(b). Rule 63(b)(1)(A) provides a means for a party who believes that a judicial officer is biased against her to "file a personal affidavit stating the facts and the reasons for the belief that bias or prejudice exists ... accompanied by a certificate of counsel of record stating counsel's belief that the affidavit is submitted in good faith." Bansda never did this. Assuming, without deciding, that appellant's claim of bias was properly preserved, we discern no error in the failure of the judge to *sua sponte* recuse himself from the proceeding.

---

**5.** Bansda's argument that the court miscalculated the conversion rate for rands and dollars must also fail because the record reveals that Wheeler introduced exhibits including a currency converter, indicating how many dollars Bansda's various overseas accounts contained, after making the conversions, and because Bansda did not object to the introduction of these exhibits. *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992) ("Points not asserted with sufficient precision to indicate distinctly the party's thesis [at the trial court level] will normally be spurned on appeal.") (citation and quotation marks omitted). Bansda's additional complaints about the judge's final order, including her contention that he abused his discretion by adopting the proposed findings of fact and conclusions of law submitted by Wheeler and by neglecting to hold a pretrial conference such that the "contentious issues of this case [could be] discussed in an open forum with a neutral adjudicator" lack merit.

■ "To be disqualifying, the alleged bias and prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Mayers*, 908 A.2d at 1194 (internal citations and quotation marks omitted); *see also Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute bias for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."). The Supreme Court has admonished that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555, 114 S.Ct. 1147. The trial court's mix-up of names and "mini-debates" with attorney Edwards do not reveal "an opinion that derives from an extra-judicial source," nor do they reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* Accordingly, the judge did not abuse his discretion in failing to recuse himself.

### D. Sanctions

On May 1, 2007, the second day of trial, the court ordered the parties to supplement their discovery responses by May 25. By letters of May 18 and 20, counsel for Wheeler informed Bansda's counsel (Ekekwe's predecessor) that discovery deficiencies remained. Counsel learned that on May 24 Ekekwe had taken over representation of Bansda.

On July 10, 2007, counsel for Wheeler filed a motion for sanctions pursuant to Super. Ct. Dom. Rel. R. 37(d) because the trial court, after its May 1 order, had again ordered Bansda to provide supplemental discovery to Wheeler, this time by July 4, 2007, and she allegedly had failed to do so. He asked for $1,460[6] in attorney's fees because of the amount of time and work counsel had put into the letters requesting additional discovery and into filing the motion for sanctions. On the last day of trial, the court heard arguments on the sanctions motion.

Ekekwe, representing Bansda, argued that sanctions should be denied because the discovery eventually had been delivered to Wheeler's counsel. Ekekwe claimed that she had sent the discovery to Wheeler's lawyer on July 4, and that when his office contacted her stating that Wheeler had not received the documents, she had sent a "courier to hand-deliver a copy to their office." Wheeler testified that he did not receive the materials until "the end of July[,] ... well after the July 4th deadline that was imposed by [the] court." The court orally granted the motion for sanctions on September 17, 2007. The judge acknowledged that the documents did finally arrive but stated that this fact did not matter because Wheeler's counsel still had to file the motion for sanctions when the materials had not arrived by July 4, 2007, and had to charge his client for the time and work required. On November 5, 2007 the court issued its written order requiring, among things, that "$1,460 be awarded to the plaintiff [Wheeler] and against the defendant [Bansda] for attorney's fees."

On behalf of Bansda, Ekekwe moved to stay the court's November 5 order. In response to that motion, on January 18, 2008, the trial court noted that "[n]o oppo-

6. *But see supra* note 3.

sition had been filed to the plaintiff's motion for sanctions," and—redirecting its November 5, 2007 order from Bansda to her attorney—ordered Ekekwe to pay $1,360[7] to Wheeler in attorney's fees for violating "Rule 11."[8] On February 21, 2008, Ekekwe filed a "Motion for Reconsideration of the Court's Order for Attorney's Fees" pursuant to Super. Ct. Dom. Rel. R. 60(b),[9] including a request for a stay of execution of the judgment pursuant to Super. Ct. Dom. Rel. R. 62(b). She argued that Wheeler's counsel had made fraudulent misrepresentations to the court when he claimed that he had not received discovery that in fact had been delivered. On March 30, 2009 the trial court denied the motion and ordered Ekekwe to pay the $1,360 within thirty days of the order. On April 17, 2009 she filed an appeal of the March 30 order. On May 14, 2009 we consolidated Ekekwe's appeal with those of her former client, Bansda.

On appeal, Ekekwe contends that the trial court erred in ordering that she be held personally liable for the sanctions imposed by the court. She argues an issue of law: that the award of attorney's fees is too extreme a sanction because, although delivery of the documents was late, Wheeler's counsel ultimately received the requested discovery materials. But she also makes factual contentions: that she "did not willfully disobey the court, nor did the party litigate for a harassing, annoying, or vexations purpose." In addition, she ar-

gues that the exceptions to the "American rule," a rule that otherwise prevents the prevailing party from recovering attorney's fees from the losing party, do not apply in this case. Wheeler replies that Ekekwe's appeal must fail because it was untimely filed, in violation of D.C.App. R. 4. He adds that even if the notice of appeal was timely, the appeal must fail because Ekekwe violated Super. Ct. Dom. Rel. R. 11, and in any event because the "bad faith exception" to the "American Rule" would apply in this case, permitting fee-shifting to favor Wheeler.

■ Contrary to Wheeler's first contention, Ekekwe's appeal is timely. She is not appealing the court's January 18, 2008 order awarding Wheeler attorney's fees against her; rather, she is appealing under Rule 60(b) the court's March 30, 2009 order denying her February 21, 2008 motion for reconsideration of the January 18 order. Because her appeal of April 17, 2009 was filed within the required thirty days, she satisfied the jurisdictional requirement if Rule 60(b) embraces her grounds for reconsideration. As noted earlier, a motion to reconsider will qualify under that rule if it alleges mistakes of fact.

We are limited, therefore, to reviewing the trial court's March 30, 2007 denial of Ekekwe's Rule 60(b) motion to reconsider its January 18, 2008 order imposing the attorney's fee sanction against her. In

---

7. *See supra* note 3.

8. The trial court, presumably citing Super. Ct. Dom. Rel. R. 11, referenced a sanctions rule different from the one cited in Wheeler's July 10, 2007 "Motion for Sanctions Against Defendant," namely, Super. Ct. Dom. Rel. R. 37(d) ("Failure of a party to attend at own deposition or serve answers to interrogatories or respond to request for inspection"). Thereafter, both Wheeler's counsel and Ekekwe began referring to Rule 11. For purposes of this appeal we need not sort out

which of the two rules, or both, were applicable, as no one questions that the kind of discovery defaults at issue can be subject to the trial court's sanctions order.

9. Ekekwe's Rule 60(b) motion was timely because it requested relief based on mistake of fact and was filed "within a reasonable time, and … not more than 1 year after the judgment, order, or proceeding was entered or taken."

this connection, we note that she does not contend that attorney's fees sanctions cannot be imposed on a party's counsel; she does not maintain that Bansda's previous counsel was responsible for the discovery defaults; and she does not question the rule under which the sanctions were imposed. Our standard of review, of course, is abuse of discretion. *Jones v. Nat'l R.R. Passenger Corp.*, 942 A.2d 1103, 1106 (D.C. 2008). We find no abuse.

When imposing sanctions on Ekekwe on January 18, 2008, the court rejected her argument that counsel for Wheeler had made fraudulent representations to the court, a ruling from which Ekekwe had not taken a direct appeal. Now, in appealing the March 30, 2007 denial of her Rule 60(b) motion for reconsideration, Ekekwe argues, as factual issues eligible for consideration under that rule, only that her conduct was not "willful[ ]" or "harassing, annoying, or vexations." [10] We perceive no basis for concluding that, upon reconsideration, the court failed to thoughtfully consider a fact-based ruling that he had issued earlier, with the amount awarded ($1,360) premised on representations by counsel for Wheeler about the amount of time he had spent on the sanctions motion.

\* \* \* \* \* \*

Accordingly, we affirm the trial court's Judgment of Absolute Divorce and its Contempt Order. We also affirm the denial of Ekekwe's Motion for Reconsideration of the Court's Order for Attorney's Fees.

*So ordered.*

---

**10.** Her legal argument on appeal, that the attorney's fee sanction was too "extreme," is not before us because it is cognizable only under Rule 59(b), which would have required the motion to be filed within ten days of January 18, 2008.