*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-FM-976 & 18-FM-1153

BRIAN D. MACKLIN, APPELLANT,

V.

JANAI T. JOHNSON, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DRB-2488-16)

(Hon. Julie H. Becker, Trial Judge)

(Argued September 29, 2020    Decided February 10, 2022)

Brian D. Macklin, *pro se*.

*Cali Cope-Kasten*, with whom *Henry J. Brewster* was on the brief, for appellee.

Before GLICKMAN and DEAHL, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion of the court by *Associate Judge* DEAHL.

Dissenting opinion by *Senior Judge* RUIZ at page 33.

DEAHL, *Associate Judge*: Brian Macklin and Janai Johnson were married for thirteen years and have five children together. Following divorce proceedings,

the Superior Court of the District of Columbia ordered that the parties share joint physical and legal custody of their children while granting Ms. Johnson primary custody and final decision-making authority.  It also awarded Ms. Johnson a 40% equitable interest in the home the family shared for more than a decade, even though Mr. Macklin purchased it individually three years before the marriage.  On appeal, Mr. Macklin challenges the court's custody ruling.  He also contends the court erred in granting Ms. Johnson any equitable interest in the home and, in the alternative, that it erred by failing to deduct the pre-marital equity he had accrued in the home before apportioning her interest in it.

On the issue of custody, we see no reversible error.  While the facts might have supported a custody arrangement more favorable to Mr. Macklin, the Superior Court carefully scrutinized the record and drew a reasonable conclusion after considering the appropriate factors, so we are bound to uphold its ruling.  As to the property distribution, we hold as a matter of first impression that substantial "homemaker" services are a permissible basis for granting a spouse an equitable interest in the other's separately-held real property and detect no error in granting Ms. Johnson an equitable interest in the family home on that basis.  Finally, while Mr. Macklin is correct that the trial court was obliged to deduct any pre-marital equity he had in the home before awarding Ms. Johnson an interest in the

remainder, the trial court did not contravene that approach. It simply found Mr. Macklin had no pre-marital equity in the home because all of its appreciation occurred during the marriage—rather than beforehand, as Mr. Macklin maintains—and because Mr. Macklin's outstanding mortgage debt on the home exceeded its value at the time the parties married. In short, every bit of equity in the home was marital equity under the trial court's reasoning. That conclusion is adequately supported by the record. We thus affirm the trial court's judgment.

## I.

Mr. Macklin purchased his house—later the family home—in February 2002, and he has remained the sole titleholder of the property at all relevant times. The house is located at 55 Quincy Place NW. Shortly after buying it, Mr. Macklin undertook substantial renovations to convert it from a multi-unit to a single-family house. That same year he met Ms. Johnson. At the time, he owned and operated a valet parking business, while she worked as an administrative assistant and waitress. After a year or so of dating, in 2003, they had their first of five children, A.M., and Ms. Johnson moved in with Mr. Macklin shortly thereafter, around January 2004. They had four more children over the next decade: K.M., R.M., C.M., and I.M. The parties married on April 19, 2005.

While Ms. Johnson worked four to five years during the marriage, she spent the bulk of their marriage caring for the children and the household. She would typically do the cooking, cleaning, and laundry, plus she would transport the children to and from school. As marriages sometimes go, theirs hit a rough patch in 2010 and Ms. Johnson began a months-long extramarital affair. She moved out of the family home for a time, but later moved back in and the parties reconciled toward the end of 2010. Ms. Johnson began another affair in 2015, and when Mr. Macklin learned of it, they had an altercation resulting in Mr. Macklin moving out of the home while Ms. Johnson stayed with the children.[1] Several months later, Mr. Macklin returned to the home and Ms. Johnson and the children moved out.

---

[1] The trial court recounted evidence that, during the marriage, both "parties were physically violent toward each other on several occasions and that each bears some responsibility for this aspect of their relationship." Because the court did not materially rely on these incidents in rendering its decision, we do not discuss them at length here. There was also some evidence that Mr. Macklin was physically violent toward the children on occasion, though for the same reason, we do not detail the evidence here. Just one purported incident merits further discussion: The trial court found that on one occasion in or around 2017, Mr. Macklin "threw" his daughter K.M. against a wall. The court credited "to a point" Mr. Macklin's claim that, rather than throwing her into a wall, he merely grabbed her by the shirt, which caused her to misstep and fall. Still, it found that, whatever happened, Mr. Macklin applied force against his daughter "that was neither reasonable in manner nor moderate in degree."

Both parties filed for divorce in late 2016. Following a six-day bench trial, the Superior Court granted the parties' mutual request for an absolute divorce. The court ordered joint physical and legal custody of the children while granting Ms. Johnson primary custody and final decision-making authority over them. By the order's terms, the children would spend every other weekend with Mr. Macklin—from Thursday afternoon to Monday morning—with two caveats. A.M. requested additional time with his father, which the court granted by extending the every-other-weekend visits to Tuesday morning in his case. K.M., on the other hand, had a strained relationship with her father and did not want to spend weekends with him, so the court did not order her to do so. It did, at Mr. Macklin's request, order that her visitation "take place in the context of family therapy."

The court also awarded Ms. Johnson a 40% equitable interest in the home. In calculating that amount, the court took the home's market value at the time of divorce ($784,000) and deducted the existing mortgage on the property ($227,000), as well as the estimated sales costs (6% of $784,000, or $47,040), arriving at a "cash-out" value of $509,960. It then awarded Ms. Johnson 40% of this figure, or $203,984. The Court explained that it credited Ms. Johnson's expert's testimony that "essentially all of the appreciation" in the home "occurred during the marriage." That is because the mortgage balance ($227,000) was greater than the

price Mr. Macklin had paid for the home in 2002 ($225,000), which—based on the record—was the apparent value of the home when the parties married. In other words, all of the equity in the home accrued during the marriage and, in fact, Mr. Macklin owed about $2,000 more on his mortgage than what the home was worth at the time the parties married.

Mr. Macklin now brings this timely appeal.

## II.

We first examine the child custody ruling. Mr. Macklin argued at trial that an equally shared schedule would best serve the children's interest, which is of paramount concern when fashioning custody arrangements. *See* D.C. Code § 16-914(a)(1)(A) (2012 Repl.). But the trial court, while ordering that the parties share joint legal and physical custody of the children,[2] agreed with Ms. Johnson that the

---

[2] "'Legal custody' means legal responsibility for a child. The term 'legal custody' includes the right to make decisions regarding that child's health, education, and general welfare, the right to access the child's educational, medical, psychological, dental, or other records, and the right to speak with and obtain information regarding the child from school officials, health care providers, counselors, or other persons interacting with the child." D.C. Code § 16-914(a)(1)(B)(i). "'Physical custody' means a child's living arrangements. The term 'physical custody' includes a child's residency or visitation schedule." *Id.* § 16-914(a)(1)(B)(ii).

children were best off with her as the primary physical custodian, granting Mr. Macklin the limited visitation rights outlined above. Mr. Macklin challenges this ruling on two grounds. First, he contends that "50/50 custody is presumed in cases with no abuse," and that the Superior Court failed to heed that purported presumption. Second, he asserts that the court abused its discretion in awarding Ms. Johnson primary physical custody because "the findings of the court do not match the facts of this case." We review these arguments in turn and conclude that neither merits reversal.

**A.**

Mr. Macklin first alleges the trial court erroneously diverged from a presumption of equal custody. We review such challenges to a trial court's application of legal standards *de novo*. *See In re T.H.*, 898 A.2d 908, 911 (D.C. 2006). Mr. Macklin's argument fails because it rests on a misunderstanding of the controlling law. *Equal* custody is not the "presumed" arrangement in the District in the absence of domestic abuse, as Mr. Macklin asserts. Rather, *joint* custody is presumptively in the children's best interests in the absence of one or more intra-

family offenses.[3]  *See* D.C. Code § 16-914(a)(2).  And, contrary to Mr. Macklin's position, joint custody is not synonymous with equal, or "50/50," custody.

We made this clear in *Estopina v. O'Brian*, 68 A.3d 790 (D.C. 2013), where we explained that a "custody arrangement constitutes 'joint physical custody' so long as it involves some sort of shared custody, such as primary physical custody awarded to one parent and visitation rights to another."  *Id.* at 792; *see also Hutchins v. Compton*, 917 A.2d 680, 682 (D.C. 2007) ("Joint physical custody may, but need not, be on a 50/50 basis.") (cleaned up).  As in *Estopina*, the trial court's custody order granting the parties shared custody, while awarding one parent primary physical custody and the other visitation, satisfies § 16-914(a)(2)'s definition of "joint custody."  The trial court thus did not fail to honor the presumption in favor of joint custody.  That is exactly what it awarded.

**B.**

Mr. Macklin next argues that the trial court's custody determination, and its factual findings, are not supported by the record.  We accord "great deference" to a

---

[3]  As recounted *supra* note 1, there was some evidence of intra-family violence, but it did not factor into the trial court's custody determination.

trial court's child custody determinations, *Prost v. Greene*, 652 A.2d 621, 626 (D.C. 1995), which reach this court "with a presumption of correctness." *In re C.T.*, 724 A.2d 590, 597 (D.C. 1999). We review the trial court's findings of fact for clear error, *In re A.C.G.*, 894 A.2d 436, 439 (D.C. 2006), and will "reverse a trial court's custody decision only upon a finding of an abuse of discretion," *Estopina*, 68 A.3d at 793. In applying these standards, we first look to whether the trial court considered "all relevant factors and no improper factor," and then we "evaluate whether the decision is supported by substantial reasoning . . . drawn from a firm factual foundation in the record." *In re A.M.*, 589 A.2d 1252, 1257-58 (D.C. 1991) (internal quotation marks omitted). That the record might have supported a different outcome is no basis for upending the trial court's decision. *Prost*, 652 A.2d at 626.

In this matter, the trial court weighed all appropriate factors without considering any inappropriate one. Indeed, the court carefully walked through all seventeen factors necessary to determining the children's best interests under D.C. Code § 16-914(a)(3). Three factors in particular animated the court's physical custody decision:

> (A) the wishes of the child as to his or her custodian, where practicable;

(B) the wishes of the child's parent or parents as to the child's custody; [and]

(C) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest.

*Id.*

Relevant to the first two factors, all three children who testified, as well as Ms. Johnson, expressed a desire to maintain their existing custody arrangement, under which Ms. Johnson had primary physical custody of the children while Mr. Macklin had more limited visitation rights. Ms. Johnson's "central reason" for seeking primary physical custody on a permanent basis was "continuity." "[S]he testified that she wishes to keep the current custody schedule because she believes it is working well for the children, and she prefers not to disrupt the routine they have finally been able to establish." The trial court agreed: "[G]iven the upheaval the family has experienced over the past two years," "stability is an important consideration." Mr. Macklin had a different preference, as pertinent to the second factor, which the trial court acknowledged. But his preference ultimately could not overcome the other factors favoring the ordered custody arrangement. The third factor likewise supports the court's decision. Despite finding that both parents had generally strong relationships with the children, the court was troubled by its

finding that the parties' daughter K.M. had no desire to see her father or have any relationship with him.

The facts supporting these findings all have a firm factual foundation in the record. *See In re A.M.*, 589 A.2d at 1257-58. In fact, Mr. Macklin does not dispute that the children preferred to maintain the then-existing custody arrangement. And the court's chief rationales for awarding Ms. Johnson primary physical custody—honoring the children's wishes, and maintaining a stable environment for them—constitute "substantial reasoning." *See P.F. v. N.C.*, 953 A.2d 1107, 1117 (D.C. 2008) (courts are "obliged to include" children's wishes in their calculus); *Estopina*, 68 A.3d at 794 ("stability and continuity" are important considerations in deciding custody petitions involving requests for geographic relocation).

The court carefully and thoroughly evaluated each of the remaining fourteen factors set forth in § 16-914(a)(3), and made findings as to each of them, as required. *See Dumas v. Woods*, 914 A.2d 676, 679 (D.C. 2007). It deemed four factors inapplicable or marginally applicable, while signaling that none of the remaining factors weighed strongly in either party's favor.

Mr. Macklin faults the trial court for relying on Ms. Johnson's accusations of domestic abuse in rendering its custody order, as he contends they were unsubstantiated. We might interpret this argument in either of two ways, but neither is persuasive. To the extent Mr. Macklin claims the court's custody ruling is itself predicated on Ms. Johnson's allegations of abuse, we disagree. The court expressly did not rely on these allegations in rendering its custody decision. *See supra* note 1. While it mentioned them in its findings, it ultimately could not say that they supported either party's claim for custody.

We might alternatively construe Mr. Macklin's argument to be that the trial court erred by essentially extending a temporary custody order Ms. Johnson secured through false accusations, in Mr. Macklin's telling. For several reasons, that argument fails as well. The temporary custody order, entered December 15, 2016, makes no mention of any allegation of abuse, and the record from that proceeding is not part of the record on appeal. *See* D.C. App. R. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion.") (citation omitted). More fundamentally, Mr. Macklin failed to identify any legal error that the trial court committed by extending the temporary custody arrangement, and we

perceive none. The court acted within its discretion to conclude that the existing arrangement was in the children's best interests irrespective of the rationale underlying the prior temporary custody order.

Mr. Macklin further charges that the trial court failed to consider evidence involving Ms. Johnson's marijuana use and extramarital affairs, but this point is equally unavailing. The court acknowledged Ms. Johnson's personal failings and found that they contributed to the deterioration of the parties' marriage. Though Mr. Macklin testified that the affairs diverted her from her parenting responsibilities, the trial court apparently determined they did not justify a different custody arrangement from the one ordered. We do not think it abused its discretion by doing so. *See Johnson v. Washington,* 756 A.2d 411, 418 (D.C. 2000) ("Child custody cases present complex factual situations, and we necessarily rely on the trial court's careful balancing of the various factors that may impact the child.").

In sum, our review of the record reveals no "clearly erroneous findings of fact," and we conclude that the court's ultimate custody decision is supported by a careful analysis of the seventeen statutory factors. We acknowledge that some judges might have weighed the relevant facts and factors differently, but our role is

not to reweigh the evidence. *See Dorsett v. Dorsett,* 281 A.2d 290, 292 (D.C. 1971) ("We cannot say that in this instance the trial judge abused his discretion, even though other evidence in the record might have led us to uphold a decision going the opposite way."). We are satisfied that the trial court did not abuse its discretion in granting Ms. Johnson primary physical custody of the parties' five children.

Finally, we turn to the trial court's legal custody decision granting Ms. Johnson final decision-making authority over matters on which the parties could not agree. While the court rejected Ms. Johnson's request for sole legal custody, it determined that one parent must have final authority, in light of the parties' "very limited capacity to reach joint decisions about the children's welfare." Without assigning blame for this inability to reach joint decisions, the court found Ms. Johnson the "more practical choice given that the children will be with her the majority of the time." Importantly, in making custody rulings, § 16-914(a) directs the court to consider "the capacity of the parents to communicate and reach shared decisions affecting the child's welfare." D.C. § 16-914(a)(3)(6). The court did not abuse its discretion by considering this factor and granting Ms. Johnson final decision-making authority based on sheer practicality. We accordingly affirm the trial court's physical and legal custody determinations.

## III.

We next examine the Superior Court's distribution of equity in the family home Mr. Macklin purchased individually prior to the marriage. Mr. Macklin challenges the order on three bases. He first suggests that non-financial homemaker contributions are not an appropriate basis to award an equitable interest in separately-held property. Next, he argues that even if homemaker services might be a basis for awarding the non-titled spouse an equitable interest in separately-owned property, the trial court's finding that Ms. Johnson rendered substantial services in that respect was unsupported by the record. Finally, he argues that even if he is wrong on the first two points, the court erroneously failed to deduct his pre-marital equity in the home before computing Ms. Johnson's interest in it, which had the effect of inflating her award at his expense. We address these arguments in turn.

## A.

In distributing property upon divorce, the District of Columbia Marriage and Divorce Act requires the trial court to first "assign to each party his or her sole separate property acquired prior to the marriage." D.C. Code § 16-910(a). The court must then "value and distribute all other property and debt accumulated

during the marriage . . . in a manner that is equitable, just, and reasonable." *Id.* § 16-910(b). Mr. Macklin argues that the trial court contravened the Marriage and Divorce Act by granting Ms. Johnson an interest in his separately-owned home. In other words, he contends the trial court committed legal error when it failed to assign him his "sole or separate property acquired prior to the marriage," and mistakenly treated his home as marital property subject to division between the parties.

The premise of Mr. Macklin's argument is mistaken. The trial court did not treat the family home as marital property, but instead correctly determined that the house qualifies as Mr. Macklin's "sole separate property" under § 16-910(a), so that he alone had an ownership interest in it. *See Ealey v. Ealey*, 596 A.2d 43, 47 (D.C. 1991) (real property "acquired prior to the marriage remains the separate and sole property of the acquiring spouse" even where "the non-purchasing spouse has contributed marital funds to pay off the mortgage"). Rather than granting Ms. Johnson an *ownership* interest in the house under § 16-910(a), the court invoked its general equity power to grant her an *equitable* interest in the property. *See Bansda v. Wheeler*, 995 A.2d 189, 199-200 (D.C. 2010). An equitable interest "encumbers the property, but it does not give the [non-purchasing spouse] any ownership or possessory interest." *Yeldell v. Yeldell*, 551 A.2d 832, 836 (D.C. 1988) (collecting

cases). Ms. Johnson does not have any say in what Mr. Macklin does with the property or in how he disposes of it (aside from enforcing her lien); nor does she have any claim to any part of the property's future appreciation. Those are rights that remain with the property's sole owner, Mr. Macklin, as the statute demands.

The distinction is critical. Our cases have long recognized courts' equitable power to encumber non-marital property in this manner. In *Brice v. Brice*, 411 A.2d 340 (D.C. 1980), we acknowledged that our courts are permitted to confer an equitable interest in one spouse in property owned by the other upon dissolution of the marriage, where "'some right or element of ownership, legal or equitable,' could be found in the spouse who did not hold title." *Id.* at 343 (quoting *Wheeler v. Wheeler*, 188 F.2d 31, 33 (D.C. Cir. 1951)). We further noted that by enacting the Marriage and Divorce Act, the D.C. Council evinced no intent to "abolish or restrict this long-standing approach." *Brice*, 411 A.2d at 343. Indeed, the Marriage and Divorce Act largely codified existing case law, which served to liberalize divorce law in the District. *See generally* Samuel Green & John V. Long, *The Real and Illusory Changes of the 1977 Marriage and Divorce Act*, 27 CATH. U. L. REV. 469 (1978). Thus, following that Act's passage, courts in our jurisdiction continue to have "broad discretion" to grant non-purchasing spouses an equitable interest in separately-owned property. *Brice*, 411 A.2d at 343.

Eight years later in *Yeldell*, we went a step further. There, we affirmed the trial court's decision to grant one spouse an equitable interest in the other's house on account of the former's $50,000 in contributions toward the mortgage on the property, twice the value of the latter's down payment. 551 A.2d at 833-34. To be sure, we made clear that D.C. Code § 16-910 forecloses a court from assigning a non-purchasing spouse an ownership interest in sole and separate property acquired prior to the marriage. *Id.* at 835. Yet we held that a trial court could grant a non-purchasing spouse an equitable interest in the property as a result of their substantial financial contributions toward the property during the marriage. *Id.*; *see also Bansda*, 995 A.2d at 199 (providing that a non-titled spouse can establish an equitable interest in the titled spouse's property by proving "substantial contributions to the home"); *Abulqasim v. Mahmoud*, 49 A.3d 828, 838-39 (D.C. 2012) ("sole and separate ownership" does not preclude a court from encumbering a property with an equitable lien in the other spouse's favor).

Mr. Macklin further suggests that, even if monetary contributions are a basis to award a spouse an equitable interest in the other's separately-held property, homemaker services—childrearing, cooking, cleaning, daily chores, etc.—are not. Our precedents have not resolved this issue. *Ealey*, 596 A.2d at 48; *see also Araya v. Keleta,* 31 A.3d 78, 80 n.2 (D.C. 2011) ("[W]e have not squarely decided

whether such intangible contributions alone can create an equitable interest in real property."). Today, we hold as a matter of first impression that substantial homemaker services can indeed entitle a spouse to an equitable interest in real property purchased by the other spouse before the marriage and used as the family home.

We have hinted at this conclusion in prior cases, albeit always in dicta. *Araya v. Keleta*, 65 A.3d 40, 52 n.18 (D.C. 2013) ("*Araya II*") (noting that earlier cases suggest that "homemaker contributions . . . may suffice . . . [to] entitle a spouse to an equitable interest in the other spouse's separate property") (internal quotations and citation omitted); *Yeldell*, 551 A.2d at 836 (suggesting that "a husband whose wife did not work would generally not recover all of his contributions because the wife would be entitled to some credit for her homemaking services") (footnote omitted); *Ealey*, 596 A.2d at 50 (affirming that "[t]wenty-three years of homemaker services may well entitle a spouse to an equitable interest under some circumstances"). In *Darling v. Darling*, 444 A.2d 20 (D.C. 1982), we acknowledged that a spouse's "substantial and extensive" non-financial contributions to another's separately-held business, "all without pay," could give rise to "an equitable interest in the business." *Id.* at 24-25. That case concerned a wife who had remodeled and decorated her husband's business,

managed it when he was on travel, maintained the mailing list, performed numerous administrative duties, and helped her husband prepare for sales events. *Id.* at 25.

These cases balked at any rigid distinctions between a spouse's financial contributions to an enterprise, on the one hand, and their uncompensated yet valuable contributions to the same enterprise, on the other. As the trial court correctly recognized, "one spouse's work in caring for the home and children" enables the other "to earn money to support the family," including the money necessary to pay any existing mortgage on the property. We have expressly acknowledged as much in the context of dividing marital property. *Araya II*, 65 A.3d at 53 (finding that "the wife contributed substantially to the marriage by bearing and raising the children and freeing the husband to build his practice and pursue his business ventures"). Absent these domestic services, the titled spouse would have had less time and/or income to maintain the property, whereas the non-titled spouse would have had more of an opportunity to acquire income to contribute financially. In fact, § 16-910(b)(7) expressly directs the trial court to consider "each party's contribution as a homemaker or otherwise to the family unit" when distributing marital property. There is no good reason to treat one spouse's homemaking contributions as having a beneficial impact on marital

property housing a family, but not on separate property doing the same. Homemaker services are, therefore, pertinent when considering whether to award an equitable interest in separately-held property as well.[4]

Most courts to have considered this issue have reached similar conclusions. *See, e.g.*, *Hanaway v. Hanaway*, 527 N.W.2d 792, 800 (Mich. Ct. App. 1995) (homemaking and childrearing qualify as contributions to the "acquisition, improvement, or accumulation" of separate property under Michigan's statute governing property distribution upon divorce); *Marks v. Marks*, 432 S.W.3d 698, 702 (Ark. Ct. App. 2014) (affirming award of husband's separate property to wife where wife lived in property for twenty years, maintained and preserved it, rendered homemaker services, and cared for adult child with a disability); *Beightol v. Beightol*, 367 S.E.2d 347, 349-50 (N.C. Ct. App. 1988) (homemaking activities by a non-titled spouse which increased the value of the titled spouse's property can entitle the former to an equitable interest in the property); *Roel v. Roel*, 406 N.W.2d 619, 622 (Minn. Ct. App. 1987) (unfair hardship justified awarding wife

---

[4] Section 16-910(b)(7) lists twelve relevant, though non-exhaustive, factors that a trial court might consider when divvying up marital property. While those factors do not affect § 16-910(a)'s command that each party shall be assigned "his or her sole and separate property," each of them may inform whether and to what extent a spouse is entitled to an equitable interest in such separately-held property.

an equitable interest in husband's non-marital property where wife "spent most of thirty-year marriage raising the parties' three children," lacked employment experience, and suffered from serious health issues).

At least one jurisdiction has reached the opposite conclusion, albeit for reasons we find unpersuasive. Utah courts, applying a statute providing for the equitable division of separate property upon divorce, have rejected the position that "household or family responsibilities" may provide a "standalone basis for awarding" a non-titled spouse an equitable interest in the other's property. *Lindsey v. Lindsey*, 392 P.3d 968, 976 (Utah Ct. App. 2017); *accord Jensen v. Jensen*, 203 P.3d 1020 (Utah Ct. App. 2009). *Lindsey* reasoned that "the give-and-take often inherent in marital relationships is generally not a sufficient basis for judicially rewriting title to property" because "[t]he presumption that parties retain their separate property at divorce would be rendered largely irrelevant if rebutted by any spousal effort that freed the other spouse to work on his or her separate property." 392 P.3d at 977. One might attempt to distinguish *Lindsey* from this case on the basis that it concerned one spouse's claim to an equitable share in the other's business, which is arguably more attenuated from homemaker services than an equitable interest in the family home, as here. But we do not rest on that distinction because *Lindsey*'s reasoning seems to apply just as readily to precluding

a spouse from claiming an equitable interest in a separately-held home based on homemaker services. So we take its rationale head on, and do not agree that our holding today will render the statutory directive that parties retain their separate property at divorce "largely irrelevant."

The directive retains its force because, as we have previously held, neither "minimal" contributions to the home, *Brice*, 411 A.2d at 343-44, nor "sporadic" services over an "undetermined period," *Mumma v. Mumma*, 280 A.2d 73, 76 (D.C. 1971), will give rise to an equitable interest in separately-owned property in the non-titled spouse. Rather, only *substantial* homemaking contributions can give rise to an equitable interest in the other's separate property. *Cf. Bansda*, 995 A.2d at 199. There is thus no basis to think that, following today's decision, courts will begin "rewriting title to property" on account of "any spousal effort," as *Lindsey* dismissively put it. 392 P.3d at 970.

If that was indeed the concern animating *Lindsey*, then it brought a bludgeon to do a scalpel's work: that minimal homemaker contributions should not give rise to an equitable interest in the other spouse's separately-owned property is no reason to preclude substantial contributions from doing so. Likewise, that allocating domestic responsibilities is an inherent feature of marriage is no reason

to disregard the value of those responsibilities. A spouse's non-monetary contributions at home often free up the other to make the money necessary to pay a mortgage on separately-owned property, and save the couple from the substantial costs of paying for childcare and home upkeep. To blink these realities would do violence to our consistent recognition that fairness sometimes demands that one spouse receive an equitable interest in the other's separate property. *See, e.g.*, *Darling*, 444 A.2d at 24-25. In assessing one spouse's equitable interest in the other's separately-owned property upon divorce, substantial homemaking contributions may (and should) be taken into consideration.

Our dissenting colleague disagrees with our conclusion, though she agrees with its core premises. Namely, she agrees that D.C. Code § 16-910 and our precedents permit one spouse's non-monetary contributions to give rise to an equitable interest in the other's separately held property. We have already explained why that is so, and while our dissenting colleague at times seems to voice some statutory and precedent-based concerns with that conclusion, she ultimately reaches it herself. The only point of disagreement is that, in the dissent's view, a non-monetary contribution can give rise to an equitable interest in separately held property only when it is a "direct contribution" to "*the property*" itself. *Post* at 38 (citation omitted). We think that is an artificial constraint and the

dissent does not offer a persuasive rationale for it.[5] A homemaker's contributions to the home are no less worthy of recognition than a carpenter's, and the dissent does not explain how it makes sense to permit the latter's contributions to give rise to an equitable interest in a spouse's separately owned home but not the former's.

The dissent retorts that "the issue in this case is not whether a homemaker's contributions are valuable and should be recognized, but how." *Post* at 39. Not quite. The issue is very much whether a homemaker's contributions are valuable and should be recognized, and the dissent's answer is a clear "no" in this case and a broad sweep of cases like it.[6] Had roles been reversed, and Mr. Macklin been a stay-at-home dad while Ms. Johnson made the money to pay off the mortgage encumbering the house, then the dissent would recognize her equitable interest in

---

[5] One rationale the dissent offers in defense of it is the need for an "adequate limiting principle," as she does not think the requirement that the contributions be substantial is sufficient for that purpose. But that was not the only limiting principle guiding the trial court's award, as it further limited Ms. Johnson's award to a share of the equity that accrued in the home *during the marriage*, leaving Mr. Macklin's pre-marital equity untouched. *See infra* Part III.C. We think that is also a sensible limiting principle.

[6] These are not particularly novel facts. It is not anomalous for a couple's assets to be tied up in home equity that accrues over the course of their marriage, despite the home being titled in only one spouse. To permit the non-titled spouse to share in the post-marriage equity only when her contributions fit within certain rigid categories—e.g., financial, masonry, woodwork—is not just an artificial and harsh rule, but one with a broader sweep than the dissent seems willing to acknowledge.

the property because her contributions would have come in the form of monetary payments that the dissent deems cognizable. The dissent simply does not extend the same recognition to a homemaker's contributions.

**B.**

Mr. Macklin next argues that even if substantial homemaker services might give rise to an equitable interest in the other spouse's separately held property, the trial court erred in finding that Ms. Johnson made such substantial contributions to the home and family. For this argument he relies on two of our precedents where we agreed with the trial court's conclusion that a spouse's contributions were not substantial. *Bansda*, 995 A.2d at 200; *Brice*, 411 A.2d at 343-44. In *Bansda*, we saw "no basis for rejecting" the trial court's conclusion that "there was no evidence of homemaker contributions" by the non-titled spouse. 995 A.2d at 200. And in *Brice* we likewise found the trial court's description of such services as "minimal" was "supported by the evidence." 411 A.2d at 344. Here, the trial court reached the opposite conclusion. It found Ms. Johnson's contributions were "substantial" in light of both her monetary contributions to the house while employed and her role as a full-time mother, "sav[ing] the family a significant amount in child care

costs," during the remaining years of the marriage.[7]  While Mr. Macklin challenges this finding as unsupported by the record, we do not share that assessment.

The record shows that Ms. Johnson was employed for roughly four or five years of the parties' marriage, and during that time, she deposited her full paychecks into the parties' joint checking account, from which the family paid all of its bills, including the mortgage on the home.  And while the court deemed her monetary contributions minimal compared to Mr. Macklin's, it found that when she was not working, Ms. Johnson contributed substantially to the family because "she was caring for the children and the household full-time."  Her responsibilities included caring for the parties' five children, cooking for the family, doing chores and laundry, and transporting the children to and from school.  The trial court noted that by Ms. Johnson's expert's estimate, her household services saved the couple about $48,000 a year in childcare expenses for their five children.  Such a contribution can hardly be described as minimal.

---

[7]  Ms. Johnson requested a 50% share of the house's value, and the court agreed with her self-description as an "equal partner [throughout] the parties' marriage."  Yet it granted her only a 40% interest in the home because (1) evidence showed that Mr. Macklin renovated the home when he first moved in, which increased its value, and (2) when Ms. Johnson moved out of the house in 2017, following the several-month period in which Mr. Macklin did not reside there, she left it with "moldy food, debris throughout, and a rat problem."

Mr. Macklin's trial counsel even acknowledged that Ms. Johnson was due *some* equitable interest in the home in light of her minimal financial contributions. When asked whether Ms. Johnson had an equitable interest in the home, Mr. Macklin's counsel replied, "Absolutely." Counsel contested only the extent of the interest to which Ms. Johnson was entitled, positing that she was due something between "zero and maybe 20[%]" of the home's value.

Mr. Macklin does not now resurrect the argument by contending Ms. Johnson was entitled to some non-zero figure less than a 40% interest. He instead challenges the Superior Court's calculation of the dollar amount that reflects the 40% interest awarded to Ms. Johnson. More specifically, he contends that if Ms. Johnson was indeed entitled to a 40% interest in the family home, the trial court should have discounted the pre-marital equity that had accrued in the home before awarding Ms. Johnson her 40% interest in it. We now turn to that argument.

## C.

Mr. Macklin's final challenge is to the Superior Court's calculation of Ms. Johnson's equitable interest in the house. To make that calculation, the court took the home's market value at the time of divorce ($784,000) and deducted Mr. Macklin's mortgage balance on the property ($227,000), as well as the estimated

sales costs (6% of $784,000, or $47,040), arriving at a "cash-out" value of $509,960. It then awarded Ms. Johnson 40% of this figure, or $203,984.

Mr. Macklin contends the court inflated Ms. Johnson's equity in the property by failing to deduct the pre-marital equity he had in the home when the parties married in 2005. In his telling, *all* of the home's appreciation—i.e., the $559,000 difference between the 2002 purchase price ($225,000) and the market value at the time of divorce ($784,000)—accrued before the parties married. In fact, he claims the home was "far more valuable" when the parties married in 2005 than when they finalized their divorce in 2019. Ms. Johnson counters that Mr. Macklin forfeited this argument by failing to raise it at trial, and she further argues that he failed to offer evidence sufficient to support his view that the home had appreciated to any degree between the purchase date and the date the parties married. We agree with Ms. Johnson on both points.

We acknowledge, as Mr. Macklin asserts, that a non-titled spouse's equitable interest in the other's property should be measured by the "reasonable value" of the spouse's contributions "during the marriage." *Yeldell*, 551 A.2d at 835. However, Mr. Macklin did not complain in the trial court—through a motion for reconsideration or otherwise—that its calculation failed to account for the pre-

marital equity he had accrued in his home, and his "failure to raise this point at trial" generally "prevents its consideration on appeal." *Gavin v. Wash. Post Emps. Fed. Credit Union*, 397 A.2d 968, 973 n.9 (D.C. 1979).

But even if Mr. Macklin had timely raised the issue, the trial court effectively addressed it when it concluded that he had no pre-marital equity in the home because he had not paid down his mortgage balance (it exceeded the home's purchase price) and because essentially all of the home's appreciation occurred during the marriage, not beforehand, as Mr. Macklin now contends. The only concrete evidence of the home's appreciation offered at trial came from Ms. Johnson's expert, who indicated that virtually all appreciation accrued during the marriage. Mr. Macklin presented no expert evidence to the contrary, and the court did not err in relying on Ms. Johnson's expert.[8] Mr. Macklin similarly offered no evidence at trial (nor does he argue here) that any equity accrued to him before the

---

[8] For the first time on appeal, Mr. Macklin argues that one of Ms. Johnson's expert's own demonstrative exhibits, displaying economic trends in the D.C. housing market, supports his claim that much of the home's appreciation accrued before the marriage. That exhibit was never entered into evidence, however, so it is arguably not before us. *See Brooks v. Rosebar*, 210 A.3d 747, 750 (D.C. 2019). And even assuming otherwise, the data Mr. Macklin describes speaks "generally to the D.C. [housing] market"; it does not purport to reflect trends in Mr. Macklin's neighborhood, much less the value of the family home over time. Critically, Mr. Macklin did not once suggest at trial that the data supported the inference he now presses.

marriage through a down payment or payment of the mortgage's principal; given that Mr. Macklin's mortgage balance of $227,000 at the time of divorce was greater than the purchase price of $225,000, the trial court had little reason to suspect he had accrued any pre-marital equity through such payments. We thus cannot fault the Superior Court for declining to deduct pre-marital equity that it had good reason to think did not exist.

There remains a question lurking in the record as to why the trial court deducted Mr. Macklin's mortgage debt, as opposed to the home's value at the time the parties married, before apportioning Ms. Johnson her percentage of its value.[9] But the issue is of no moment in this case because the two numbers are nearly identical and no party complains about the minor discrepancy that resulted from deducting the mortgage balance rather than the home's pre-marital value ($227,000 and $225,000, respectively). In fact, the trial court's decision to deduct the greater figure worked to Mr. Macklin's advantage by awarding Ms. Johnson $800 less than the amount to which she otherwise would have been entitled (40% of the

---

[9] To illustrate the pitfalls of simply deducting the mortgage debt, consider a scenario where Mr. Macklin had no mortgage debt coming into the marriage. If that were the case, and the trial court had deducted nothing from the home's value at the time of divorce (because it was unencumbered by debt), Mr. Macklin could rightly complain that the trial court failed to deduct the $225,000 of pre-marital equity he had in the home.

$2,000 difference). And, at bottom, the trial court had a firm basis for concluding that Mr. Macklin had no pre-marital equity in the home, or—put slightly differently—that the home's value at the time of their marriage was entirely offset by the mortgage debt he separately carried on the property.

We add one final caveat to the above analysis. Contrary to how we have described its findings above, the trial court seemed to acknowledge that the house had appreciated by some amount before the parties' marriage, owing to Mr. Macklin's substantial renovation work on the home. But given Mr. Macklin's failure to quantify the monetary value of those renovations, we find the trial court's crude accounting for those improvements to be quite reasonable: It reduced Ms. Johnson's share of equity in the home from 50% to 40%—reducing her equitable interest by more than $50,000—in large part to account for Mr. Macklin's pre-marital renovation work. *Supra* note 4.

## IV.

The judgment of the Superior Court is affirmed.

*So ordered.*

RUIZ, *Senior Judge*, dissenting in part[1]:  I disagree that the trial court's award of a 40% equitable interest in appellant's separate property can be sustained and dissent from part III of the majority's opinion.  My conclusion is based on the statutory language, our precedents in which an equitable interest in separate property was allowed and the record in this case.

In dealing with property owned by the parties to a divorce, the trial court's authority is clearly dictated and differs radically depending on whether the property is "separate" or "marital" property.[2]  The first obligation of the trial judge is to assign sole and separate property to its owner.  D.C. Code § 16-910(a) (2021 Supp.).  Property is "separate" if it was acquired either prior to the marriage or "by gift, bequest, devise, or descent" during the marriage.  *Id.*[3]

---

[1]  I agree that the trial court's custody ruling should be affirmed and join the majority opinion in that respect.

[2]  The parties can depart from this scheme by a valid antenuptial or postnuptial agreement.  D.C. Code § 16-910.

[3]  It also includes "any increase thereof[] or property acquired in exchange therefor . . . ."  D.C. Code § 16-910(a).

The statutory scheme is very different with respect to "all other property" — property acquired during the marriage regardless of title (excepting separate property acquired during the marriage by "gift, bequest, devise or descent"). With respect to what is usually referred to as "marital property" the trial court has broad discretion to "value and distribute" the property (and debt) "in a manner that is equitable, just, and reasonable, after considering all relevant factors . . . ." D.C. Code § 16-910(b). The statute contains a non-exhaustive list of twelve factors, including the relative financial condition and prospects of the parties. The statute specifically lists as factors "each party's contribution as a homemaker or otherwise to the family unit" and "each party's contribution to the acquisition, preservation, appreciation, dissipation, or depreciation in value of the assets which are subject to distribution . . . ." D.C. Code §16-910(b)(7) & (10).

This appeal concerns separate real property, a house on Quincy Street, N.W. appellant acquired three years prior to the marriage. After he bought it, appellant made substantial renovations to the property to convert it from a multi-unit building to a single family dwelling. The family lived in the house.

Although the trial court formally recognized that the property belonged to appellant, it imposed an equitable lien on the property amounting to 40% of his

equity in the house, encumbering almost half the value of appellant's interest in his separate property. The trial court did so after taking into account the two factors listed above which the statute provides for consideration in the distribution of *marital* property: contribution as a homemaker to the family unit and contribution to the dissipation of the property (in this case, appellee's neglect of the house after appellant had moved out). In effectively treating appellant's separate property as if it were marital property, the trial court committed legal error.[4]

The majority attempts to get around this statutory obstacle by citing cases in which this court has recognized the trial court's "general equity power" to encumber separate property with a lien while preserving ownership and possession in the owner spouse. However, the instances where this court has mentioned the

---

[4] The majority comments that the statutory mandate was preserved because title to the property remained with appellant and appellee "does not have any say in what [appellant] does with the property or in how he disposes of it (aside from enforcing her lien)." *Ante* at 17. The trial court is prohibited from granting an ownership interest as is made clear by the statute and our precedent. *See Yeldell v. Yeldell*, 551 A.2d 832, 836-37 (D.C. 1988). That the trial court adhered to that injunction by preserving appellant's legal title does not mean what the trial court did does not have real world consequences that affect the owner's use and enjoyment of the property. Imposition of an equitable lien is not simply recognition of a debt. The lien is itself an enforceable property right, recordable in public land records. It could stand in the way of the owner's freedom to alter the property or refinance the mortgage. Depending on what other encumbrances exist or contractual undertakings that relied on appellant's ownership of the property, the lien could accelerate contractual obligations or constitute an act of default.

trial court's authority to impose an equitable lien on separate property — mostly in dicta — hew closely to the statutory scheme by focusing on the non-owning spouse's contributions *to the property itself*. That was not the case here, where the trial court and the majority are focused on the appellee's homemaker services that contributed *to the family*.

The cases cited by the majority do not sustain the broad proposition relied upon by the trial court in this case, that one spouse's contributions in the form of homemaker services during the marriage generally can form the basis for an equitable lien on separate property. As the majority recognizes, that issue has not been decided in any of this court's cases that it cites: *Brice*, *Yeldell*, *Bansda*, *Ealey*. Those cases dealt with monetary payments made by one spouse that directly enhanced the property or preserved ownership of the separate property itself. There is no precedent for the majority's opinion because this case departs from our prior decisions concerning equitable liens on separate property in that the contributions were not monetary and were not directed to the acquisition or enhancement of the separate property itself.[5]

---

[5]   As the trial court recognized, but the majority appears to overlook, *Darling v. Darling*, 444 A.2d 20 (D.C. 1982), was a very different case. There the separate property at issue was a business owned by the husband before the

The reason given by the majority for burdening appellant's separate property with an equitable lien unwisely breaks new ground untethered to the statutory scheme that makes a clear distinction between separate and marital property. Appellee's contribution as a homemaker was not directed to the separate property itself — real property in the form of a house — but to managing the household. Contributing to the acquisition and improvement of the Quincy Street *house*, a physical structure, and contributing by caring for children and managing the *home* are not the same thing. Yet the majority treats them as if they were.

The majority deals primarily with justifying the lien based on the in-kind contribution of homemaking services but does not come to grips with the critical fact that the appellee's contribution as homemaker was not "a substantial contribution to the acquisition (or increase in value) *of the property . . . ." Ealey v.*

---

marriage. The wife made significant non-monetary contributions by improving and managing the business during the marriage and the question presented was whether those contributions transformed the business from separate property to marital property subject to equitable distribution under the statute. *Id.* at 24. The court held they did. *Id.* The case did not involve imposition of an equitable lien on separate property. What is instructive is that, as in the one case cited — *Yeldell* — where this court upheld imposition of an equitable lien, the court in *Darling* was also focused on the non-owning spouse's contributions that preserved or enhanced the value of the separate property itself, in that case, a business. There is nothing comparable here.

*Ealey*, 596 A.2d 43, 48 (D.C. 1991) (emphasis added); *see Yeldell v. Yeldell*, 551 A.2d 832, 835 (D.C. 1988) (while the trial court could not award husband half of legal title in house that wife owned separately prior to marriage, an equitable lien could be imposed in recognition of "the reasonable value, as of the date of the divorce, of his [monetary] contributions *to the property* during the marriage" (emphasis added)). In this case, there is no comparable direct contribution by appellee — monetary or in kind — to the house that was appellant's separate property. The majority conflates contributions to "the home" with contributions to the Quincy Street house. A comment in the majority opinion illustrates the point. It argues that "a homemaker's contributions to the home are no less worthy of recognition than a carpenter's." *Ante* at 25. But the issue in this case is not whether a homemaker's contributions are valuable and should be recognized, but how. The statute recognizes homemaker services by providing such contributions "to the family unit" are to be taken into account in distributing marital property. D.C. Code § 16-910(b)(7). The critical distinction between a spouse's contribution as a carpenter and as homemaker is that the former enhances the value of the separate property itself whereas homemaking creates value for "the family unit" that the statute designates for recognition in an equitable distribution of marital

property. The separate property is a house on Quincy Street, a piece of real estate, not the family.[6]

The majority attempts to close this gap by a circuitous route, adopting the trial court's statement that the appellee's "work in caring for the home and children" enabled appellant "to earn money to pay the mortgage and otherwise maintain his separate property." Without further analysis, this generic statement is economically incoherent; without findings based on evidence it cannot be sustained. Moreover, the statement implies that appellant enriched himself unfairly from appellee's labor at home because it enabled him to pay the house mortgage from his earnings and keep the separate property for himself. But that is not so. Both parties benefitted. Appellant made his Quincy Street house available for the family's use. By paying the mortgage on the property appellant saved the family's finances the cost of paying rent — not unlike how the appellee's contributions as a homemaker saved child care costs. The money that appellant earned also went to support the family's needs for food, clothing, medical and other expenses. Moreover, the premise that appellee's work at home indirectly

---

[6] To the extent the trial court made any finding with respect to appellee's contributions to the house's value, it was to note her neglect of the property once appellant moved out — to the point of reducing her equitable interest by 20%, from half to 40%.

helped to pay the mortgage collapses if one imagines a slightly different, but not uncommon, scenario. Appellant could have kept his house on Quincy Street as an investment property and rented it out, using the rent collected to pay for the mortgage, taxes, etc. In short, without careful consideration of the parties' contributions and underlying finances in context there is no logic or evidentiary basis to conclude, as the trial court and the majority do, that appellee's contributions as a homemaker made servicing the mortgage on the Quincy Street property possible and did so to such an extent that she was entitled to 40% of appellant's equity. The relevant question is whether a spouse contributed to the acquisition or enhancement of the separate property and in what amount.[7]

There was no such careful parsing in this case. Rather, the essence of the court's reasoning for imposing the lien was generic, that appellee was "an equal partner in the parties' marriage" and "the efforts of both spouses were necessary to

---

[7] The majority expresses dismay that "had roles been reversed," with appellant a stay-at-home Dad, and appellee working outside the home and paying the mortgage, she would be entitled to an equitable lien on the house. That result is dictated by *Yeldell*. In that case the husband paid the mortgage on a house the wife acquired prior to the marriage and owned as her separate property. 551 A.2d at 833. The wife also worked outside the home and contributed to improvements to the house and paid utility and other household expenses. *Id.* We upheld the grant of an equitable lien to the husband based on a calculation of the mortgage payments he made. *Id.*

the family's functioning over the years." That might well be true but largely beside the point because the issue was not contribution to the family's functioning during the marriage — that is compensable in the distribution of marital property — but appellee's contribution to the separate property. The court began its assessment of the lien in favor of appellee at half the value of appellant's equity in the house, and justified its decision to award 40% to appellee in light of appellant's investment in improving the property and appellee's dissipation of its value due to her neglect of the house during the seven months that she lived there alone with the children. This is classic reasoning for distribution of marital property, starting at a 50-50 division, and making adjustments from that base. Indeed, the trial court used virtually the same language in imposing the lien on the separate property as it did in distributing the marital property. *Compare* Court Order at 24-25 (imposing equitable lien: appellee "was an equal partner in the parties' marriage . . . the efforts of both spouses were necessary to the family's functioning over the years") and 31 (distributing marital property: appellee "was an equal partner to her husband throughout the parties' marriage. . . . Court cannot find that these [homemaker] contributions should be valued differently").

It is telling that in denying appellee's request for alimony, the trial court's order noted that it had awarded "over $250,000 in marital assets" and relied on

*Sudderth v. Sudderth*, 984 A.2d 1262, 1266 (D.C. 2009), for the proposition that "it is within the trial court's discretion to award marital property in lieu of alimony." But of the $254,424 awarded to appellee, 80% ($203,984) was not marital property but attributable to the lien on appellant's separate property. And *Sudderth* was inapposite because it dealt with marital, not separate, property. *See id.* The reasoning and the language of the trial court's order show that the two categories of property the statute takes pains to distinguish were substantially indistinguishable in the trial court's mind.

The majority opinion similarly functionally erases the distinction between marital property and separate property when it declares, *ante* at 21, "[t]here is no good reason to treat one spouse's homemaking contributions as having a beneficial impact on marital property housing a family, but not on separate property doing the same." The unambiguous statutory scheme that draws a bright line between separate and marital property and expressly provides that homemaker contributions are to be taken into account in distributing marital property is a very good reason to treat them differently.[8] The majority's observation that "it is not anomalous for a

---

[8] The trial court's reasoning grounded on the parties being equal partners in a joint enterprise of marriage sketches the outline of what could be an agreement between the parties — the antenuptial or postnuptial agreement contemplated in

couple's assets to be tied up in home equity that accrues over the course of their marriage, despite the home being titled in only one spouse," *ante* at n.6, also belies the statutory line between separate and marital property. The statute expressly provides that increase in the value of separate property remains separate. D.C. Code § 16-910(a) (separate property includes "any increase thereof[] or property acquired in exchange therefor"). Thus, the increase in the equity of the property during the marriage remained appellant's separate property. Nor is it a matter of title, as marital property remains marital "regardless of whether title is held individually or by the parties in a form of joint tenancy or tenancy by the entireties. . . ." D.C. Code § 16-910(b).

The majority opinion has opened the door to the imposition of liens on separate property based on homemaker contributions without an adequate limiting principle or guidance to the trial court. It says there is no reason to be concerned because to give rise to an equitable interest, the homemaker's contribution must be "substantial." But what does that mean? Does "substantial" refer to whether the homemaker services are full- or part-time? The length of time during which they

---

the statute, *see supra* note 2. But the existence of such an agreement was not argued and the trial court made no such finding.

are provided? Their quality? Whether the homemaking spouse had more remunerative options available? And once it is determined that a spouse made a "substantial" contribution to the family as a homemaker, does it now automatically follow that in the District of Columbia an equitable interest is created in the other spouse's separate property? What guides that determination?

It is no answer to say that homemaker services are "valuable." *Ante* at 25. Even assuming homemaker services can form the basis for an equitable lien on separate property, that generalization does not "determine the reasonable value, as of the date of the divorce, of [the non-owner spouse's] contributions to the property during the marriage." *Yeldell*, 551 A.2d at 835. Valuations are necessary to determine whether the spouse should be granted an equitable interest in the spouse's separate property and, if so, in what amount. *See Ealey*, 596 A.2d at 48-50 (assuming, without deciding, that homemaker services can be considered in imposing an equitable lien on separate real property and noting that "the trial judge should generally place a monetary value on the non-monetary contributions, particularly when requested to do so and a formula is proposed").[9]

---

[9] Appellee presented evidence that her work at home had a value of $47,800 in after-tax income, but the trial court did not accept her "precise quantification." Instead, the court found generally that appellee's work at home saved the family "a

There is an aphorism that bad facts make bad law. This case presented with bad facts and the trial court was faced with a tough situation. One unalterable fact was that there was not much in the way of marital property for distribution to the parties.[10] Moreover, the trial court determined that appellee had not made out a case for alimony. The appellee's income was limited: child support from appellant, her relatively small earnings as an artist and public assistance. It seems apparent that the trial court attempted to remedy the appellee's straitened financial resources by reaching for appellant's Quincy Street property because it was the only asset with significant value. That would have been authorized if the house had been marital property; the trial court enjoys broad discretion in distributing marital property taking into account a number of factors. Here, the house was not available for distribution. An equitable lien on separate property is not a convenient all-purpose judicial tool on hand to effect a work-around the statutory scheme enacted by the legislature that draws a bright line between separate and

---

significant amount" in child care costs and that this effort is "no less important than the other parent's income-producing work."

[10] Only 20% of the amount awarded to appellee was attributable to marital property. The trial court awarded appellee half the value ($50,440) of two properties appellant purchased during the marriage that were marital property.

marital property and carefully delineates the court's authority in dealing with each. The trial court's scope of action in the exercise of its "general equity power" is not unbounded and must be respectful of the applicable statute and our cases. In my view, the trial court's order imposing a lien on the house owned by appellant exceeded both.

The majority makes a policy determination that is for the legislature, not the courts, particularly as it pertains to an area of law in which the legislature has spoken by establishing a detailed scheme for how separately owned assets and marital property are to be assigned and distributed at the end of a marriage. If the court is to take the lead and for the first time hold that homemaker services can be the basis for an equitable interest in separate property it should provide clear rules for how it should be done, specifically, that homemaker services must be shown to have contributed to the acquisition or improvement of the separate property and given a reasonable valuation. Neither was done in this case with any specificity or evidentiary basis. At a minimum the case should be remanded for further proceedings. "Given this uncertain record, the trial court on remand should explain fully how it calculates the value of the [appellee's] contributions. If the court believes that it does not have enough information on which to base a

decision, it may in its discretion receive additional testimony." *Yeldell*, 551 A.2d at 836.